## THE STATE v. ALBERT MARTIN and WILLIAM SNEED, Appellants.

### Division Two, March 15, 1910.*

1. **INFORMATION: False Pretense: Sufficiency: Felony.**   An information which fails to charge that the alleged false pretense was "designedly" used to obtain the money or other valuable thing, is insufficient to charge an offense under Sec. 1927, R. S. 1899. But if it does not follow the form prescribed by Sec. 2213, but sets forth with particularity, as the information in this case does, the trick and deception and fraudulent representation

---

* Note.—Affirmed May 18, 1909.  Motion for rehearing filed, and motion sustained July 13, 1909.  Judgment again affirmed March 15, 1910, and additional opinion filed.

made by the defendant, it sufficiently charges the offense denounced by said section 2213, and charges a felony, and not a misdemeanor, though the amount of money or other valuable thing by the fraudulent representations obtained was of less value than thirty dollars.

2. **FALSE PRETENSE: Manner by Which Defrauded Person Obtained Money.** It matters not how the defrauded person obtained the money of which defendants defrauded him. Even if he had not obtained it at all, but felt that he owed it to Wilcox, because he had trespassed upon Wilcox's land and cut ties and timber therefrom, and was induced by the false pretenses and representations of defendants to pay the money he thought he owed Wilcox to one of the defendants, supposing and believing he was paying it to Wilcox, defendants are chargeable with the offense, and the court properly refused an instruction telling the jury that if the money paid by the defrauded person to one of the defendants was for the purpose of preventing a criminal prosecution against him for cutting timber from the lands of Wilcox they should acquit defendants.

3. **INSTRUCTION: Refusing Defendant's.** Where the court has of its own motion given full and proper instructions upon the subject of the credibility of the witnesses, including the defendant who was a co-conspirator, it is not error to refuse an instruction asked by defendant upon the same subject.

4. **VARIANCE IN NAME.** Where the defendant was indicted under the name of Albert Martin, and the evidence points unerringly to Albert Martin as the guilty party, the fact that either in the stenographer's notes or in an inadvertent mistake by the prosecuting attorney in asking questions, the name Robert Martin was occasionally used, is an immaterial variance, and will not work a reversal. [Sec. 2534, R. S. 1899.]

Appeal from Maries Circuit Court.—*Hon. Wm. H. Martin*, Judge.

AFFIRMED.

*Pope & Terrill, Jos. Crites* and *Watson & Holmes* for appellant.

(1) We do not know of any section of the statutes under which the information could have been drafted except 1927 or 1930. The amount charged to have been obtained was less than $30 and could be no greater offense than petit larceny. R. S. 1899, sec. 1910; State

v. Brossler, 139 Mo. 524; State v. Pickett, 174 Mo. 663; State v. Keyes, 196 Mo. 136; State v. Anderson, 186 Mo. 25. (2) The charge in the information is that defendants represented to W. D. Bull that James Denton was D. B. Wilcox, and thereby enabled Denton to procure fifteen dollars from Bull. The evidence is to the same effect. There is no evidence that defendants received any part of the money. Under the information and evidence no crime was proven against defendants and they should have been acquitted. State v. Schaeffer, 89 Mo. 271; State v. Cameron, 117 Mo. 641; State v. Newell, 1 Mo. 248; State v. Evers, 49 Mo. 542; State v. Fraker, 148 Mo. 143; State v. Wilson, 143 Mo. 334; State v. Davis, 138 Mo. 107; State v. Lawrence, 178 Mo. 350; State v. Bohle, 182 Mo. 58. (3) This case does not come within the meaning of section 2213, R. S. 1899. State v. McChesney, 90 Mo. 120; State v. Cameron, 117 Mo. 641. (4) In this case the evidence disclosed the fact that Bull had been stealing timber from a tract of land known as the D. B. Wilcox tract, or had been charged with stealing timber from such tract, and the money paid was to prevent a prosecution therefor. Such being the case, instruction "C" should have been given.

*Elliott W. Major*, Attorney-General, and *John M. Dawson*, Assistant Attorney-General, for the State.

(1) (a) The information is drawn under section 2213, R. S. 1899, and is not based on section 1927 or 1930. The defendants having violated one or more sections of the statute, with different punishments affixed, it does not lie in their mouths to say under which statute they shall be charged and tried. That is for the State to say. The information is sufficient. State v. Beaucleigh, 92 Mo. 490; State v. Williams, 77 Mo. 310; State v. Porter, 75 Mo. 171; State v. Williams, 12 Mo. App. 415; State v. McNerney, 118 Mo. App. 60. (b) The information sufficiently iden-

tified the name of the victim. State v. McChesney, 90
Mo. 120. And meets the objection contained in the
following cases: State v. Pickett, 174 Mo. 663; State
v. Hesseltine, 130 Mo. 468; State v. Clay, 100 Mo.
578; State v. Terry, 109 Mo. 601; State v. Jan-
son, 80 Mo. 97. (c) Acts of a defendant similar
to the one for which he is being tried, committed near
the same time and at the same place, are admissible
against him to show the intent with which the act
charged was done. State v. Keyes, 196 Mo. 147; State
v. Wilson, 143 Mo. 334; State v. Turley, 142 Mo. 403;
State v. Sarony, 95 Mo. 352. (2) (a) The test is
whether or not the defendant could plead in bar the
judgment rendered against him, be it either a con-
viction or acquittal. State v. Woodward, 156 Mo.
147. All the elements necessary to charge the crime
are laid in this information and the constitutional pro-
vision is complied with. Constitution, art. 2, sec. 22;
State v. Vorback, 66 Mo. 168. And is unlike the cases
of State v. Terry, 109 Mo. 601; State v. Benson, 110
Mo. 18; State v. Hubbard, 170 Mo. 346. (b) The
assuming of a false name, or even a fictitious one may
be a false pretense if thereby the fraud is accomplished.
2 Bishop's New Crim. Law, sec. 440, p. 254. The
information in this case meets every requirement of
the Constitution. It sets forth the exact nature of the
false representations made by the defendant, minutely
and in detail, and identifies the victim, and in every
way describes the offense. State v. Cameron, 117 Mo.
376; State v. Fancher, 71 Mo. 460; State v. McChesney,
90 Mo. 120; State v. Horn, 93 Mo. 190; State v. Beau-
cleigh, 92 Mo. 490; State v. Connelly, 73 Mo. 235;
State v. Crooker, 95 Mo. 389; State v. Terry, 109
Mo. 601; State v. Jackson, 112 Mo. 585; State v.
Sarony, 95 Mo. 349. This was the same Albert Martin,
the appellant. (3) Section 2533, R. S. 1899, is con-
stitutional. State v. Schricker, 29 Mo. 265; R. S. 1899,
sec. 2534. Variance between the pleading and proof

will not operate as a reversal of the case. State v. Sharp, 71 Mo. 218; State v. Smith, 80 Mo. 520; State v. Harl, 137 Mo. 252. Variance, under the statute, is properly confided to the trial court. State v. Decker, 217 Mo. 320; State v. Hunible, 34 Mo. App. 347; State v. Black, 12 Mo. App. 534; State v. Stone, 15 Mo. 512; Weaver v. McElhenon, 13 Mo. 91; State v. Haveley, 21 Mo. 500; Rex v. Foster, 1 B. C. 412; State v. Riley, 100 Mo. 498; R. S. 1899, sec, 2535. (4) A variance is an essential difference between the pleading and the proof. There was no such difference between the charge in the information and the evidence in this case. Mulligan v. U. S., 120 Fed. 98; Skinner v. Grant, 12 Vt. 456. A party objecting to the variance between the pleadings and the proof must make his objection at the proper time during the trial, and if he does not do so, he cannot afterward avail himself of the objection. Kruger v. State, 135 Ind. 575; Graves v. State, 121 Ind. 357. A variance is understood to be a substantial departure from the issue in the evidence adduced, and must be in some matter in point of law essential to the charge or claim. 29 Am. and Eng. Ency. Law (2 Ed.), p. 580. Even a mistake in a verdict by writing the defendant's name ''Farmness'' instead of ''Framness,'' was held to be immaterial. State v. Framness, 43 Minn. 490. We reassert the trial court settled the matter contained in appellant's motion for rehearing.

GANTT, P. J.—This is an appeal from a conviction and sentence of the circuit court of Maries county. On the 5th of October, 1908, the prosecuting attorney of said county filed an amended information charging the defendants, together with James Denton and Lafayette Sneed, with the crime of obtaining money by means of false and fraudulent representations. The cause was dismissed as to Denton and Lafayette Sneed, and the defendants Albert Martin and William Sneed

were found guilty and their punishment assessed at three years in the penitentiary. Inasmuch as one of the principal questions arising in the case is whether the information charges a felony or a misdemeanor, it will be necessary to set it forth. The information, omitting the caption, is in these words:

"Joseph W. Mosby, prosecuting attorney within and for the county of Maries in the State of Missouri, upon his oath of office informs the court that heretofore, to-wit, on or about the 9th day of November, 1907, and long prior thereto, at the county of Maries and State of Missouri, one D. B. Wilcox, was the owner of a certain tract of land situate, lying and being in said county of Maries in the State of Missouri, described as follows, to-wit:

"The west half of section twenty-eight, and the west half of the southeast quarter of section twenty-eight, the northwest quarter of section thirty-three, and the south half of section thirty-three, all in township thirty-nine of range ten.

"And that the said D. B. Wilcox, as the owner of said tract of land, was then and there entitled to have and receive from one W. D. Bull, a certain sum of money, to-wit, the sum of fifteen dollars, on account of and for timber which the said W. D. Bull had theretofore cut and removed from said tract of land, and that on the said 9th day of November, 1907, at the said county of Maries and State aforesaid, James S. Denton, Albert Martin, William Sneed and Lafayette Sneed, with the intent then and there unlawfully and feloniously to cheat and defraud the said W. D. Bull, then and there unlawfully, knowingly and feloniously did falsely and fraudulently represent, state and pretend to the said W. D. Bull that the said James S. Denton was then and there the said D. B. Wilcox, the owner of the said described tract of land, and that he, the said James S. Denton, so falsely and fraudulently represented as the said D. B. Wilcox, as aforesaid, was

then and there entitled to have and receive from the said W. D. Bull the said sum of fifteen dollars on account of and for timber which the said W. D. Bull had cut and removed from the said tract of land aforesaid, and that the said W. D. Bull believed said false and fraudulent representation, statements, and pretenses, so made as aforesaid by the said James S. Denton, Albert Martin, William Sneed and Lafayette Sneed, to be true, and being deceived thereby, was induced by reason thereof to then and there pay, and did pay, to said James S. Denton the said sum of money, to-wit, the sum of fifteen dollars, and that the said James Denton, Albert Martin, William Sneed and Lafayette Sneed by means and by use of the said false and fraudulent representations, statements and pretenses so made as aforesaid, then and there unlawfully, knowingly and feloniously did obtain from him, the said W. D. Bull, the said sum of fifteen dollars, in money of the value of fifteen dollars, the property and money of him, the said W. D. Bull then and there being, with the intent then and there unlawfully and feloniously to cheat and defraud him, the said W. D. Bull, of the same, whereas, in truth and in fact, the said James S. Denton, was not the said D. B. Wilcox, and was not the owner of the said described land, and the said James S. Denton, Albert Martin, William Sneed and Lafayette Sneed, or either of them, did not then and there have any right or authority whatever to collect, have or receive from the said W. D. Bull the said sum of fifteen dollars in money or any part thereof, for or on account of timber cut and removed from said tract of land by said W. D. Bull, or on any account whatever. And the said James S. Denton, Albert Martin, William Sneed and Lafayette Sneed, then and there well knew the said false and fraudulent representations, statements and pretenses, made as aforesaid, to be false; against the peace and dignity of the State," etc.

It appeared from the testimony that on and prior to the 9th of November, 1907, one D. B. Wilcox, a non-resident of the State of Missouri, was the owner, or at least the reputed owner, of about nine hundred acres of land in sections 28 and 33, township 39, range 10, in Maries county, Missouri; that said Wilcox was unknown in the neighborhood of said land; that W. D. Bull, John Bull, Richard Blackwell, Thomas Hanks and defendants Albert Martin, William Sneed and Lafayette Sneed, all lived in the neighborhood of this land in Dry Creek township of said county; that said land was timbered land; that W. D. Bull had gone upon said land, either by mistake or as a trespasser, and cut enough timber to make at least fifteen railroad ties, without any authority from the owner of said land, or any one having authority over the same. It also appeared that other neighbors of Bull had in the same manner cut timber on these lands; that the defendants, Martin and Sneed, conceived of a fraudulent scheme whereby Denton, who lived in the city of Rolla, in Phelps county, and who was at the time a stranger in Dry Creek township, should represent himself as D. B. Wilcox; that the defendants, Martin and Sneed, and Lafayette Sneed designed to have Denton go to Maries county and into said Dry Creek township in the neighborhood of this land and represent himself to W. D. Bull, as well as to other parties in the neighborhood, to be the true owner of the said lands and to represent himself to be D. B. Wilcox, with the intent to cheat, wrong and defraud said W. D. Bull, by settlements and compromises for the timber cut by Bull, and obtain from said Bull the price of the timber, and to also obtain moneys for the same purpose from the other parties who had cut timber on said lands. It transpired from the testimony that Denton was successful in personating Wilcox and in obtaining from W. D. Bull ten dollars in money and

226 Sup—35

five dollars in services, and also obtaining from other neighbors in the neighborhood for timber so cut on said land and for the purpose of avoiding criminal prosecutions against them, in total $115, which sum Denton divided equally between the defendants, Martin and Sneed, and himself. Denton was not the owner of the land nor any part of it, and never had owned it and was a stranger in the neighborhood and a stranger to the land.

Í. Before proceeding to an examination of the other alleged errors, the first proposition presented by the defendants is that this is a prosecution either under section 1927 or 1930, Revised Statutes 1899, and consequently that the offense, conceding the guilt of the defendants, is but a misdemeanor and punishable only as petit larceny, whereas, the court construed the indictment as charging an offense under section 2213, Revised Statutes 1899, and consequently a felony, and accordingly instructed the jury, and the jury assessed their punishment as and for a felony and they were sentenced to the penitentiary for a period of three years each.

The statute law of this State on the subject of obtaining money by means of false and fraudulent representations, until 1879, was incorporated in what is now known as section 1927, Revised Statutes 1899. It was first enacted by the Territorial Legislature in 1808. Under this section it has been ruled that the guilty party was liable to be punished by imprisonment in the penitentiary if the amount of money or property obtained by the false pretense was such as would have sustained a conviction for grand larceny, had he stolen it, and if less he is punishable as for petit larceny. In State v. Pickett, 174 Mo. 663, this section was brought in juxtaposition with section 2213 of the same revision, and it was pointed out that under section 1927 the false pretense must have been "designedly" used to obtain the money or other val-

uable thing, and that this phrase could not be omitted without vitiating the indictment, whereas under section 2213, the money or other valuable thing must be obtained "by means of or by use of some trick, deception or some false pretense," etc. It is pointed out in that case also that this court has time and again held that the form of indictment prescribed in this section is unconstitutional. [State v. Terry, 109 Mo. 601; State v. Kain, 118 Mo. 5.] In State v. McChesney, 90 Mo. 120, it was ruled that where the statutory form was insufficient, as we have repeatedly held the form prescribed in section 2213 to be, "the pleader must draw his indictment according to the rules of the common law and these rules would require him to set forth with particularity 'the trick, deception, or false and fraudulent representations,' so that the accused would be informed sufficiently of the cause and nature of the accusation by the particular description of the trick, device, or false pretense contained in the indictment."

If we are to follow the decision in State v. Pickett, supra, we think it is apparent that the information in this case is insufficient to charge an offense under section 1927, as it utterly fails to charge that the alleged false pretense was "designedly" used to obtain the money or other valuable thing.

Does it sufficiently charge an offense under section 2213? It will be seen that the pleader by way of inducement states the exact relationship of all the parties, the ownership of the land by Wilcox, the cutting of the timber thereon by Bull without authority of law and the false and fraudulent representation of the defendants to Bull that Denton, one of their co-conspirators, was then and there Wilcox, the owner of the said described tract of land, and was entitled to have and receive from Bull $15 on account of and for the timber which Bull had cut and removed from said tract, and that Bull believing said false and fraud-

ulent representation and pretenses and being deceived thereby, was induced *by means thereof* then and there to pay and did pay Denton the said sum of fifteen dollars, and that the defendants "by means and by use of the said false and fraudulent representation, statements and pretenses so made as aforesaid, then and there unlawfully, knowingly and feloniously did obtain from him, the said Bull, the said fifteen dollars with the intent then and there feloniously to cheat and defraud him." Thus it would seem that the pleader rejected the statutory form in 2213, and set forth with particularity the trick and deception and fraudulent representation made by the defendants to Bull by means of which they obtained his money. It seems to us, the pleader has stated every constituent element of the statute and has used all the statutory language which individuates this offense. In our opinion the information sufficiently charges an offense under section 2213. [State v. Woodward, 156 Mo. 143.] Under this section of the statute, it is sufficient if the defendant obtains any money, property or valuable thing whatever, so that it is not necessary that the information should charge the property to be of the value of thirty dollars in order to constitute the offense a felony.

II. As to the second assignment of error, to-wit, that there was no evidence that defendants received any part of the money paid by Bull to Denton, counsel have evidently overlooked the record. Denton testified positively that he paid Sneed and Martin each one-third of the $115, including that which he had received from Bull and from the other parties in the neighborhood, who had been cutting the timber on this land.

III. It is insisted that the court erred in refusing the following instruction:

"The court instructs the jury that if they believe from the evidence that the money paid by W. D. Bull

to James Denton was for the purpose of preventing a criminal prosecution against him for cutting timber from the lands of David B. Wilcox, then they should find defendants not guilty.''

Upon what theory the defendants insist upon this instruction, we are not advised. Concede that Bull and his neighbors had been trespassing upon the lands of Wilcox and cutting the timber thereon without authority, and that they might have been prosecuted criminally therefor, how does it lessen the offense of these defendants, who were not the owners of the land and timber, that, seizing upon their knowledge of the illegal taking of the timber, they concocted the scheme of extorting money from Bull and his neighbors by representing Denton to be Wilcox and causing him to make a demand for payment for the timber, which neither he nor they were entitled to. We think the court properly brushed aside this instruction. Whatever offense Bull was guilty of, it formed no justification for the criminal conduct of these defendants in extorting money from him by means of the false and fraudulent representations and fraudulent simulation of Mr. Wilcox.

IV. The refusal of the following instruction is assigned as error:

''The court instructs the jury that there is no evidence to prove that W. D. Bull cut any timber from the lands described in the information and they will therefore acquit the defendants.''

This instruction was properly refused because Bull testified that he had cut ties from the Wilcox land. And knowing that he had, he fell an easy victim to the fraudulent scheme of the defendants, who were also cognizant of his cutting the timber.

V. Defendants also challenge the instructions given by the court upon the ground that they permitted the jury to find the defendants guilty of a felony. No other error is predicated on the court's

instruction. A careful reading of them indicates that they were prepared with much care and with a due regard to the rights of both the State and the defendants. For the reasons given in the first paragraph of this opinion, the court did not err in instructing the jury that, if they found the facts stated in the information and instructions, then the defendants were guilty of felony and punishable by imprisonment in the penitentiary.

VI.    There was no error in refusing the instruction designated as "E" for the reason that the subject of the credibility of the witnesses, including Denton, was fully covered by instructions number 10 and 11 given by the court of its own motion.

Discovering no reversible error in the record and the proceedings the judgment of the circuit court must be and is affirmed.

*Burgess* and *Fox, JJ.*, concur.


## ON MOTION FOR REHEARING.

At the April term, 1909, this cause was argued and decided and the judgment affirmed against both the defendant Albert Martin and William Sneed. Separate motions for rehearing were filed and the motion of Sneed was overruled, and the motion of the defendant Martin was sustained, and the cause set down for rehearing, in order that the record might be re-examined as to whether the defendant Albert Martin was identified by the testimony as one of the parties who had conspired with the said Denton and obtained the money of the said Bull and the other parties who had cut the timber, by means of the fraudulent representations and pretenses. The cause was reheard and submitted upon new briefs by counsel for Martin, in which it was earnestly insisted that the defendant Albert Martin was not identified as one of the

conspirators, but that one Robert Martin was the guilty party.

Addressing ourselves now to this contention, we find in the evidence of Bull, the following: "Q. Are you acquainted with Albert Martin? A. Yes, sir." It will be borne in mind that the defendant Albert Martin was then on trial and present in court. He was then asked if he saw "William Sneed, Alvin Sneed, Robert Martin, Ralph Wilcox or James Denton on the 19th of November, 1907. A. All but Alvin Sneed."

Thereupon James Denton was called as a witness, and it appears that he was asked this question: "You are acquainted with Robert Martin? A. Yes, sir. Q. William Sneed? A. Yes, sir. Q. Alvin? A. Yes, sir. Q. How long have you been acquainted with these three men? A. I have known Martin for the last five years, Mr. Sneed for the last year, I do not know exactly." Later on Denton testified: "Sneed then asked me if I knew Robert Martin; then he began to tell me, in the presence of Chas. Davis, what his business was and what a fine thing he had of making some money. He said there was some fellows making ties on land up close to his home, on land belonging to a man in California and another man in Detroit, Michigan, and then he asked me if I would come and pass myself off in the name of Wilcox and make these fellows compromise for chopping the ties, so I told him that I would not do that, and he says; 'All right.' Then he goes away and comes back later on, I do not know the exact date. He comes back again and asks me and I refuse again. Then he comes the third time and asks me and I said I would. He gave me fifty cents to pay my way to Dixon, which fare is forty cents. He told me Robert Martin had made the other arrangements, and that he would meet me at Dixon and give me the plans of the grounds they had chopped the ties on. I came to Dixon and met Martin. He punched me in the side and said, 'It will not do for

us to be here together,' and so we walked towards the lumber yard. There were three men sitting twenty-five feet of me and one of them looked like he was the owner of the lumber yard. The men went away and Robert began to talk to me. He told me to go to the livery stable and get a horse and ride it over. I told him I was afraid to get it there and I believed I would go to the hill and catch an engine and go back, he says: 'You are a fool, them suckers are easy. There is some of the s— of b— there now, hauling ties across the track.' Well, I told him I would go up there and see about the horse, but I did not ask the man at all, and came back and told him the livery man would not let me have a horse and I found Robert by the side of the well, his team was standing in the meantime hitched to the rack, so he says, 'You walk out of Dixon and I will overtake you and you can ride with me.' So I walked about a mile and he overtook me. He had in his wagon a barrel of nails, said he was going to build a new house. We passed several people, a man and a lady. Then as we was going out he gave me a list of the gentlemen that had been chopping and he says, 'Copy this off on another piece of paper, because they will recognize my handwriting.' He told me to go down to Sneed's house and stay all night, then he told me to go down to the first house on the right of the road, and he let me off the wagon, and I went down to the house. He introduced me as Wilcox, who had come to see about the timber that had been chopped on my grounds. After supper we walked out in the yard and I told Sneed that Martin told me to tell him to chop the telephone wires, he replied he would do that after we went to bed, so next morning Sneed told me to go down and have William Bull go around with me, but I told him I would not do that as I did not know him."

Later on in his testimony, Denton testified to receiving the money from Bull and from another party

who brought the money to him that evening at Sneed's house. "Q. Who was there when he paid you the money? A. Albert Martin and Willie Sneed. Q. Then where did you go? We went a couple of miles in the woods to Richard Blackwell's." He then detailed how he went to the house of the other parties and that Blackwell and another man named Bull did not have the money, but said they would bring it to Will Sneed's house. These last mentioned two brought the money to Sneed's house and Will Sneed and Albert Martin were there, and he took the thirty dollars and wrote them a receipt for it and they left and went away. He was asked then what he next did, and answered, "Well, we were making plans as to how I would get away from there that night so we went down in the woods Martin and Sneed and I and we divided up the money which I had collected, I had collected $115. I gave them two-thirds and I kept one-third. They thought I had better get out right away and decided that I would ride behind Martin on his black horse. So Martin took me on to the road and he got behind me on the horse. He says, 'If we meet anybody, we will go so fast they will not see us or cannot tell who we are, and Robert jumped off the horse and ran around in the woods and overtook me again a little further on the road, and when we got near Dixon, he got hold of an old rail and struck the telephone wire two or three times and broke it. I judge this was about two and a half miles from Dixon. He took me in sight of Dixon. This is as far as I went."

He testified further that Mr. Martin gave him a plat and said he got it from Mr. Holmes of Vienna, a relative of Mr. Holmes of Rolla.

W. H. Holmes testified: "Q. Are you acquainted with Albert Martin? A. Yes, sir. Q. I will ask you if you saw him in the month of November, 1907. A. Yes, sir, he came to me and asked me to make a plat of some land in Maries county, but I am not certain

about the month now. I think it was long about that time. Q. What did you do with the plat that you made? A. I gave it to Mr. Martin. Q. Was William Sneed with Martin at that time? A. Sneed was not with him in the office, Martin came and asked for the plat and got the addresses of the parties that owned the land from the collector's files. I gave him the address of the men who paid the taxes on the land. Q. Did you see Sneed that day? A. Yes, sir, he was in town that day. Q. Was he with Robert Martin? A. Yes, both came to me, and I said it would take some time to make the plat and when they came back I think Sneed stayed out in the hall, he did not come in the office.''

James West testified: ''Q. Are you acquainted with Albert Martin? A. Yes, sir. Q. How long have you known him? A. Fifteen years. Q. I will ask you whether you saw Albert Martin on the 18th of last November, 1907, on the road from Dixon to Vienna? A. I saw him there in November, but do not remember the exact date. Q. Do you remember when the trouble occurred, about the people getting into trouble for cutting timber out on Dry Creek? A. Yes, sir. Q. Was it about that time? A. It was the same week I heard about the trouble. Q. Where did you see him on the Dixon road that day? A. He was about three-fourths of a mile this side of Dixon. Q. Who, if any one, was with him? A. I do not know the man. He was a stranger with him. Q. How were they traveling? A. They were in a wagon.''

Mrs. Ethel Hanks testified that in November, 1907, she lived one and one half miles from Haden; she was acquainted with Albert Martin. ''Q. I will ask if you remember seeing Albert Martin on the evening of November 18, 1908, pass along by your house in a wagon? A. Yes, sir. Q. What else was in the wagon? A. He had a small barrel, this was late in the evening.''

Albert Blackwell testified that he was acquainted with Albert Martin and William Sneed. "I reside about one and one-half miles from Sneed's and a couple of miles from Martin's. They lived there on the 19th of October last." Remembered a man that passed himself off as Wilcox on the 19th of November, 1907. He saw this man at the sawmill at Tom Nelson's farm that day. This man Wilcox came up to him and demanded fifteen dollars for cutting timber on his land. "I did not have any money and did not pay him, but went home and came back about five o'clock and had the money. He told me to come up to Sneed's house. I went to Bill Sneed's house and Albert Martin and a fellow that called himself Wilcox were there then. Bill Sneed was standing in front of the shanty. As I got pretty close Martin kept backing away, and then I paid Denton the money."

John Bull testified that Denton, *alias* Wilcox, called on him on the 19th of November, 1907, at the sawmill and demanded fifteen dollars for chopping timber on his ground, and that he got the money and went to William Sneed's that evening to pay him. Albert Blackwell, or Ebb Blackwell, and Robert Martin were there. This was on the occasion that Albert Blackwell testified that Albert Martin was the Martin that was present at that time.

Robert Sneed testified that he was a cousin of the defendant William Sneed and lived in that neighborhood in November, 1907; that Denton, under the name of Wilcox, made a demand on him also for fifteen dollars for timber. That when he got to Mr. Will Sneed's house that evening he saw Albert Blackwell and William Sneed, Martin and Bull, and this fellow they called James Denton; he then paid him the money and took his receipt.

Charles Davis testified that he lived in Rolla, Missouri, in November, 1907; was in the barber business. He was acquainted with Albert Martin and

William Sneed, these two came to his shop together, at least he saw them there together before this difficulty.

This is sufficient reproduction of the testimony on this proposition. Keeping in view the fact that Albert Martin was one of the defendants in the case and that the court submitted to the jury the question whether the defendants Albert Martin and William Sneed conspired with James Denton to obtain the money and property of W. D. Bull by means of the false pretenses, and that the jury responded to the instruction by finding, not that Robert Martin was a party to the said fraudulent scheme, but that the defendant Albert Martin was, the question is now, whether the misnomer of the defendant Albert Martin by the style of Robert Martin entitled him to a reversal of this judgment. A careful scrutiny of this evidence will show, we think, that the designation of the defendant as Robert by the stenographer in his notes was a clear mistake. Davis, the barber, in whose shop Denton worked in Rolla, testified to William Sneed and Albert Martin, the two defendants herein, coming to his shop to see Denton in November, 1907, before this fraudulent trick was perpetrated on these parties in Maries county. The evidence of Mrs. Hanks corroborated that of Denton to the effect that, on the day before this fraudulent device was carried into effect in that neighborhood, she saw Albert Martin, whom she knew well, coming along the road from Dixon, in a wagon with a small barrel in it. Denton says he rode in that wagon with Martin and that the latter had a keg of nails in the wagon. That the Martin with whom Denton was riding was Albert Martin there was ample evidence to substantiate.

Robert Sneed paid his contribution to the scheme at William Sneed's and the evidence of Albert Blackwell establishes that the defendant Albert Martin was present at that time with Denton and William Sneed.

The calling of the defendant Robert Martin, by Denton, did not require the jury to find that he was other than Albert Martin when Albert Blackwell, who lived in the same neighborhood and knew him well, testifies that it was Albert Martin. Moreover, Denton testified that having collected $115 from their dupes in that neighborhood, he proceeded to divide the same with Albert Martin and William Sneed, the two defendants in this case. That Albert Martin, the defendant, was the Martin who was the master spirit in this conspiracy and who laid the plans is furthermore evidenced by the fact that this same Albert Martin went to Mr. Holmes in Vienna, the county seat of Maries county, and employed him to make him a map of the lands belonging to Wilcox and then procured the names from the collector's book of the owners of those lands. It is plain that the defendant, Albert Martin, was confused with this name of Robert Martin, either by the stenographer or the prosecuting attorney. Thus, Mr. Holmes having testified that he knew Albert Martin and at his request had prepared this plat of the land, was asked if he saw William Sneed that day in Vienna, and he said he did, and he was asked if he saw him with Robert Martin, and he answered, ''Yes, they both came to me and I said it would take some time to make the plat.'' Now, clearly it was Albert Martin for whom Mr. Holmes made the plat, and if the prosecuting attorney did inadvertently use the name Robert instead of Albert in his question to Sneed, the witness evidently did not understand that he was talking about a different person from Albert Martin. Now, this Albert Martin who obtained this plat in this way, gave it to his codefendant, Denton, with a list of the names of the trespassers, and it was this same Albert Martin and William Sneed who were present when Albert Blackwell went to William Sneed's house and paid over the money to Denton, and it was this same Albert Martin a defendant in this case who was

attempting to get out of view of Mr. Blackwell and not be seen in company with his conspirators that evening. And Albert Martin was the man seen by James West on the evening before, riding in a wagon with Denton. Denton testified that when Albert Martin gave him the plat and the list of names, he told him that Mr. Holmes had made a plat for him. He got it there in Vienna.

Claude Denton also testified that Albert Martin, the defendant, came to him in the Arcade saloon and said, "If you will get your brother to play crazy and not appear against me, I will give you any thing you want." He told him to state the price and Claude said he could not do that.

That there was ample evidence to show that Albert Martin, the defendant, was one of the parties to this conspiracy, notwithstanding the fact that in some way the name of Robert has crept into the record at various places, we think there can be no doubt whatever. In fact there is no evidence that there ever was such a man as Robert Martin outside of the mere inaccurate designation of the defendant himself as such. This cause was prosecuted against Albert Martin and William Sneed, they were the defendants on trial and the evidence tends to show that they were the two parties who first conceived this crime and went to Rolla and procured the services of Denton, an ex-convict, in carrying it out. Notwithstanding the misnomer of "Robert," there still remains ample evidence to show it was Albert Martin, the defendant in this cause, who went to Rolla and engaged James Denton at Dixon and took him out in a wagon to Dry Creek. It was Albert Martin who procured the plat of the land of Holmes and gave the names of the trespassers who had been cutting timber thereon, together with this plat, to James Denton, and furnished Wilcox's name to Denton. There was no misnomer in his name when he was recognized by the witnesses as being

present at Sneed's shanty when three of the victims came over and paid their money to Denton, nor was there any misnomer when Denton divided the $115 between Albert Martin and William Sneed and himself. It is significant that in the motion for new trial, the defendant nowhere suggests to the court that he had been convicted on evidence tending to show that one Robert Martin a different person had committed the crime and not the defendant. Neither was there an instruction asking that the jury should disregard the testimony as to Robert Martin.

Section 2534, Revised Statutes 1899, provides: "Whenever on the trial of any felony or misdemeanor, there shall appear to be any variance between the statement in the indictment or information and the evidence offered in proof thereof, in the *Christian name* or surname, or both Christian name and surname, or other description whatsoever, or any person whomsoever therein named or described, or in the name or description of any matter or thing whatsoever therein named or described, or in the ownership of any property named or described therein, such variance shall not be deemed grounds for an acquittal of the defendant, unless the court before which the trial shall be had shall find that such variance is material to the merits of the case and prejudicial to the defense of the defendant."

A careful reading of this whole testimony will show that at most this name of Robert was but a mistaken description or a variance in the name of the defendant Albert Martin who was on trial. Notwithstanding this misnomer of the defendant, the other evidence in the case points unerringly and conclusively to this defendant Albert Martin not only as one of the parties guilty of this fraudulent trick and device, but that he was the principal conspirator in the matter. Had this point, now made in this court for the first time, been called directly to the attention of the circuit

court, that court would have been fully justified in holding that the variance was immaterial and did not prejudice the defendant. Having granted a rehearing of this cause in order that this evidence might be fully examined, we are of the opinion that the case was properly decided at the April term, 1909, and that the evidence fully identified the defendant as one of the guilty parties with the fraudulent pretense and scheme by which the parties were fleeced out of their money.

*Burgess* and *Fox, JJ.,* concur.