## THE STATE v. AARON B. DONALDSON, Appellant.

### Division Two, June 1, 1912.

1. **INDICTMENT: Conclusion.** An indictment concluding with the constitutional requirement of "against the peace and dignity of the State," though those words are attached to the last separate clause negativing defendant's false representations, is in proper form.

2. ————: **False Representation.** An indictment alleging that the false pretenses defendant made were that a certain corporation owned in fee simple 900 acres of land described, that such lands were free and clear of incumbrances and indebtedness, that said company was solvent and not indebted to any one, and that the shares of its capital stock were then and there worth their par value, and then alleging, with sufficient definiteness, that the prosecuting witness, believing said pretenses to be true and being deceived thereby, was induced to purchase certain shares of the stock and to execute and deliver to defendant in payment therefor his negotiable promissory note for $8000 and that by means of said fraudulent representations the defendant did obtain from said witness the said note, with the intent him then and there to cheat and defraud, and then negativing separately each false representation, meets every requirement of good pleading, and is not defective in failing to state the contract with more particularity, either as to the sale by defendant to the witness of the shares of stock referred

to, or in that it does not allege that the stock so sold was not of the value of $8000, or that by delivery of the note to defendant the witness sustained injury.

3. FALSE PRETENSE: Evidence: Attendant Circumstances: Attempt to Marry Victim's Daughter. In the prosecution of defendant for selling stock of an insolvent corporation which he represented to be solvent, and for obtaining the purchaser's money in exchange for said stock by false pretense, testimony that defendant, before he ever applied to said purchaser to buy, became acquainted with the purchaser's widowed daughter, visited her at his house, represented himself to them to be married but suing for a divorce which would soon be granted, and entered into a pretended marriage engagement with her, and was received in their home as a member of the family and continued his visits and attentions until he had induced her father to buy the stocks, and thereafter began to suggest obstacles in the way of the marriage, is competent—as tending to show it was defendant's scheme to obtain the confidence of the father through the prospective marriage with the daughter. Where devious methods of approach are resorted to in order to allay suspicion and gain the confidence of an intended victim, a wide range in the reception of testimony is allowed.

4. ————: ————: Representations to Other Intended Victims. Testimony tending to prove that defendant, charged with false pretenses in selling mining stock, made similar representations to other persons, in selling or attempting to sell stock in the same company after the date of the crime charged, was properly admitted for the purpose of proving the element of criminal intent.

5. ————: ————: Sufficiency: Domestic Note. Where the testimony is conflicting on the point of whether the note defendant obtained by false pretense was delivered in this State or Illinois, and there is substantial testimony that it was delivered in this State, the question becomes one for the jury to settle.

6. ————: ————: ————: Investigation. It is not necessary to a conviction that the false pretenses should be the sole inducement to the victim for parting with his property; it is enough if they have a controlling influence, although the victim made an incomplete investigation. Whether the victim relied upon the false representations as the main inducement, is the question for the jury.

7. ————: ————: ————: Means of Discovering Falsity. It is not for the defendant to say that his victim might, by the exercise of vigilance, in the use of the means at hand, have discovered the falsity of his representations and thus have escaped being defrauded.

8. ————: Evidence That Victim was Actually Defrauded. Testimony tending to prove that defendant, in pursuance of his false representations ás to the solvency of the mining company, obtained from his victim his note for $8000 in payment of stock, that the note was of that value and that it was actually paid, was sufficient to show that his victim was defrauded and injured.

9. REMARKS OF PROSECUTING ATTORNEY: Failure of Defendant to Deny Other Testimony: Substantial Rights. The prosecuting attorney has no right, in his argument to the jury, to comment upon the fact that defendant, while on the witness stand, failed to deny certain facts testified to by other witnesses. But unless such error is prejudicial to the substantial rights of defendant on the merits, the Supreme Court is forbidden by the Statute of Jeofails to reverse the judgment upon that ground. The court permitted testimony that defendant, charged with false pretense in selling mining stocks to his victim, had wooed the victim's widowed daughter, and engaged to marry her, had represented he was a married man but that his wife was a woman of disreputable character and a divorce suit was pending and would soon be decided in his favor, and when it was he and the widow would be married; and this testimony is held to be competent. The prosecuting attorney in his argument to the jury, commented upon the fact that defendant, while on the witness stand, had not denied having told said widow his wife was a disreputable woman, and had not denied that he had made false representations in the same town, in endeavoring to sell stock to others. *Held*, that the comment could not have prejudicially affected defendant's rights and would not justify a reversal—since the court instructed the jury that the representations to others could be considered only to prove criminal intent, and what defendant said about his wife being disreputable was of no significance as proving his guilt.

Appeal from St. Louis City Circuit Court.—*Hon. Eugene McQuillin*, Judge.

AFFIRMED.

*T. J. Rowe, Thos. J. Rowe, Jr.*, and *Henry Rowe* for appellant.

(1) The indictment fails to state sufficient facts to constitute a violation of section 4565, Revised Statutes 1909. (2) The verdict is against the overwhelming weight of the evidence. (3) The court erred in

permitting Ora B. Ridgeley to testify that she was engaged to marry the defendant when he obtained a divorce from his wife; and that he told her she was a disreputable person. (4) Instructions offered by defendant should have been given. The court did not properly instruct the jury; and did not instruct them on all questions of law necessary for their information. (5) James Shaner, assistant circuit attorney, in his closing address to the jury was permitted, notwithstanding defendant's objections, to make improper remarks to the jury.

*Elliott W. Major,* Attorney-General, and *John M. Dawson,* Assistant Attorney-General, for the State.

(1) The indictment is drawn under section 4765, Revised Statutes 1909. It sufficiently describes the offense and identifies the name of the victim. State v. McChesney, 90 Mo. 120. The test is whether or not appellant could plead in bar the judgment rendered against him, be it either a conviction or acquittal. State v. Woodward, 156 Mo. 147. All the elements necessary to charge the crime are laid in this indictment, and the constitutional provision is complied with. Constitution, art. 2, sec. 22; State v. Vorback, 66 Mo. 168. It sets forth the exact nature of the false representations made by appellant minutely and in detail, identifies the victim, and in every way describes the offense. State v. Cameron, 117 Mo. 376. (2) Evidence of other similar crimes is admissible to show intent to defraud. State v. Saroney, 95 Mo. 352; State v. Turley, 142 Mo. 403; State v. Eilson, 143 Mo. 334; State v. Keyes, 196 Mo. 147; State v. Martin, 226 Mo. 538. The court gave the jury a cautionary instruction upon this evidence which has often been approved by this court. Evidence of similar false pretenses is particularly relevant when it appears that the fraudulent act for which the accused is on trial does not stand alone, but is a part of the scheme, not merely to defraud one

person, but to swindle the community at large. Under-hill on Crim. Ev. (2 Ed.), sec. 4438; People v. Whelan, 154 Cal. 472; State v. Briggs, 74 Kans. 382; People v. Gray, 67 Cal. 275; People v. Neyce, 86 Cal. 393; People v. McGlade, 139 Cal. 70; 7 Ency. Evidence, 627; 12 Cyc. 408, 411; 1 Wigmore on Evidence, sec. 320; 2 Wharton's Crim. Law, sec. 2128. (3) The fact that the victim, Mr. Downs, made the flying trip to the mine does not make the pretense absurd or irrational, nor does it show that Mr. Downs had at the very time the means of detecting the fraud. 2 Wharton, Crim. Law, secs. 1187, 1188; 2 Bish. Crim. Law, secs. 433, 434; Commonwealth v. People, 14 Ill. 348. It was long ago settled in England that the pretense need not be such as would impose upon a man of ordinary caution, and the American courts are harmonious on the proposition. State v. Williams, 12 Mo. App. 415; State v. Montgomery, 56 Iowa, 195; Smith v. People, 47 N. Y. 303; People v. Pray, 1 Mich. N. P. 69; Colbert v. State, 1 Tex. App. 314; Johnson v. State, 36 Ark. 242. It is impossible to estimate false pretense other than by its effect. 2 Bish. Crim. Law (8 Ed.), sec. 436; May v. State, 17 Tex. App. 213; State v. De Lay, 93 Mo. 98; State v. Evers, 49 Mo. 542. The note described in the indictment was obtained by appellant by the means denounced in the statute. State v. Willard, 109 Mo. 247; Watson v. People, 87 N. Y. 566; Clark & Marsh. on Crimes, pp. 831-833; State v. Janson, 80 Mo. 97; State v. Vandenburg, 159 Mo. 230; State v. Hubbard, 170 Mo. 346; State v. Keyes, 196 Mo. 136. (4) Courts are loath to reversing judgments on account of improper remarks of attorneys—especially as in this case where the proof of guilt is clear. In such case a verdict of guilty would likely have been returned, regardless of the improper remarks. State v. Hess, 240 Mo. 147; State v. Dietz, 235 Mo. 341; State v. Harvey, 214 Mo. 411; State v. Church, 199 Mo. 638; State v. Hibler, 149

Mo. 484; State v. Summar, 143 Mo. 220; State v. Dusenberry, 112 Mo. 294; R. S. 1909, sec. 5115.

KENNISH, J.—At the February term, 1911, of the circuit court of the city of St. Louis, appellant was tried upon an indictment charging him with having violated section 4765, Revised Statutes 1909, by obtaining from James E. Downs, by means of false and fraudulent representations, the promissory note of said Downs for the sum of $8000. The jury returned a verdict of guilty, assessed appellant's punishment at imprisonment in the penitentiary for a term of three years, and from the judgment entered upon the verdict he appealed to this court.

The indictment, omitting caption and signature, was as follows:

"The grand jurors of the State of Missouri, within and for the body of the city of St. Louis, now here in court, duly impaneled, sworn and charged, upon their oath present, that Aaron B. Donaldson, on or about the twenty-second day of November, one thousand nine hundred and nine, at the city of St. Louis aforesaid, feloniously, designedly, knowingly and fraudulently, with the intent then and there to cheat and defraud one James H. Downs, did falsely represent, pretend and state to the said James H. Downs that a certain corporation known and named the Mississippi Valley Iron and Furnace Company, and incorporated under the laws of the State of Missouri, owned in fee simple nine hundred acres of mineral lands, located, situated and being in Butler and Wayne counties in said State of Missouri; that the properties of the said the Mississippi Valley Iron and Furnace Company were then and there free and clear of indebtedness and incumbrance; and that the said the Mississippi Valley Iron and Furnace Company then and there was in good solvent condition and had no indebtedness and

was not indebted to any person or persons, and that the shares of the capital stock of the said the Mississippi Valley Iron and Furnace Company were then and there of the value of one hundred dollars per share and worth their par value; and the said James H. Downs believing said false pretenses and representations so made by the said Aaron B. Donaldson as aforesaid, to be true, and being deceived thereby, was induced by reasons thereof, to then and there purchase from the said Aaron B. Donaldson, three hundred and seventy shares of the capital stock of the said the Mississippi Valley Iron and Furnace Company, and as part of the purchase price therefor to then and there deliver and transfer to the said Aaron B. Donaldson, a certain valuable thing, to-wit, a certain negotiable promissory note, executed by the said James H. Downs and dated at the city of St. Louis in the State of Missouri, November twenty-second, one thousand nine hundred and nine, promising to pay to the order of said A. B. Donaldson, three months after date, the sum of eight thousand dollars with interest from date at the rate of six per cent per annum, and of the value of eight thousand dollars, and the said James H. Downs then and there did deliver and transfer the said valuable thing, to-wit, said negotiable promissory note described as aforesaid for the sum of eight thousand dollars, to him the said Aaron B. Donaldson, as and for part of the purchase price of said three hundred and seventy shares of stock described as aforesaid and the said Aaron B. Donaldson then and there feloniously, wilfully, designedly, knowingly and fraudulently, in the manner aforesaid, and by means of the fraudulent representations aforesaid, did obtain of and from the said James H. Downs the said valuable thing, to-wit, the said negotiable promissory note for the sum of eight thousand dollars, executed by the said James H. Downs as aforesaid, and of the value of eight thousand dollars, all the property of the said James H.

Downs, with the intent him, the said James H. Downs, then and there to cheat and defraud of the same.

"Whereas in truth and in fact the said corporation, the Mississippi Valley Iron and Furnace Company, did not then and there own in fee simple nine hundred acres of mineral lands located, situated and being in Butler and Wayne counties in said State of Missouri, as he, the said Aaron B. Donaldson, then and there well knew; and,

"Whereas, in truth and in fact, the properties of the said the Mississippi Valley Iron and Furnace Company were not then and there free and clear of indebtedness and incumbrances, as he, the said Aaron B. Donaldson, then and there well knew; and,

"Whereas, in truth and in fact, the said the Mississippi Valley Iron and Furnace Company was not then and there in good solvent condition and then and there had a large indebtedness and was largely indebted to divers persons, to-wit, the National Iron Mining Company, a corporation, and other persons to these grand jurors unknown, as he, the said Aaron B. Donaldson then and there well knew; and,

"Whereas, in truth and in fact, the said shares of the said capital stock of the said the Mississippi Valley Iron and Furnace Company were not then and there of the value of one hundred dollars per share, nor worth their par value, as he, the said Aaron B. Donaldson, then and there well knew; against the peace and dignity of the State."

As the record contains the testimony of many witnesses and also much documentary evidence, we shall state only such facts as are necessary to an understanding of the questions of law raised during the progress of the trial and now before us for review.

The evidence for the State tended to show the following facts:

At the time the offense is alleged to have been committed the defendant was engaged in the broker-

age business in the city of St. Louis and resided in that city with his family, which consisted of his wife and five children. James H. Downs, from whom the note in question was obtained, was a wealthy retired farmer, seventy-two years old, and lived at Assumption, Illinois. His daughter, Mrs. Ora B. Ridgeley, had been granted a divorce from her husband and made her home with her parents. In April, 1909, the defendant was introduced to Mrs. Ridgeley in St. Louis. Soon after this introduction he called upon her several times at her father's home in Assumption and became acquainted with the father. In August, 1909, he made a proposal of marriage to Mrs. Ridgeley and the proposal was accepted. It was agreed that the wedding should take place some time in December. Mr. Downs was informed of the engagement. Both he and Mrs. Ridgeley knew the defendant was a married man. He represented to them, however, that he and his wife had been separated for two years; that he had a divorce suit pending and would obtain a decree of divorce before December. He told Mrs. Ridgeley he had left his wife because she was a disreputable woman. He was then living with his wife, and there was no divorce suit pending. After the pretended marriage engagement he was a frequent visitor at the Downs home, where he was received by the members of the family as Mrs. Ridgeley's accepted suitor.

Having thus gained the confidence of Downs, the defendant interested him in mining stocks which he had for sale, and in October, 1909, sold him some shares of stock in the Williamsville Iron Mountain Ore Company and the Black River Iron Ore Company, receiving therefor $35,000. Shortly after this sale was made the defendant arranged for the reorganization of a corporation known as the Mississippi Valley Iron and Furnace Company (hereinafter referred to as the Mississippi Valley Company), whereby he acquired control of that company and of the sale of its stock. One

reason for his alliance with the latter company was
that he desired to pacify dissatisfied investors in the
two former companies, by having the Mississippi Val-
ley Company take over the assets of the other com-
panies and issue to the stockholders in those compan-
ies two shares of its capital stock for each share of
stock they held in either of the other companies. This
arrangement was consented to by the owners of the
Mississippi Valley Company. The assets of the Mis-
sissippi Valley Company consisted of 249½ acres of
land owned in fee simple, 2753 acres on which it had
leases and mining rights and some worn-out machin-
ery and equipment. It had purchased all of its prop-
erty from the National Iron Mining Company and
was indebted to that company, as part of the purchase
price, in the sum of $26,000. The defendant knew these
facts when he acquired control of the Mississippi Val-
ley Company. In a written proposition made to the
company, dated October 27, 1909, and signed by the
defendant, stating the terms upon which he would take
charge of the company and the sale of its stock, there
was this statement: "It is also understood that the
company owes for its land $26,000."

After Downs was informed of the marriage en-
gagement, and after the defendant had secured con-
trol of the Mississippi Valley Company, the defendant
stated to Downs that if the latter would surrender his
stock in the Williamsville Iron Mountain Ore Company
and the Black River Iron Ore Company and pay
$18,000 in addition, he would issue and deliver to
Downs therefor one thousand shares of the capital
stock of the Mississippi Valley Company of the par
value of $100 per share. He represented the purchase
of stock in the latter company to be a fine investment;
that its stock was worth its par value; that it owned
nine hundred acres of land in fee simple; that it was
free of indebtedness and its property was clear of in-
cumbrance. At the invitation of the defendant, Downs

and Mrs. Ridgeley accompanied him to Keener, Missouri, to see the property of the company.   On this trip the defendant repeated to Downs the representations concerning the company and its property.   The party returned to St. Louis and while there Downs accepted the offer made by the defendant and executed to him his promissory note for $8000, being the note mentioned in the indictment.   The note is dated ''St. Louis, Missouri, November 22, 1909.''   A receipt was given to Downs by the defendant, dated at the same time and place as the note, reciting that the defendant had received from Downs $18,000, for which Downs was to receive, as soon as a certain pooling agreement was completed, one thousand shares of the capital stock of the Mississippi Valley Company, of the par value of $100 per ·share.   Downs and Mrs. Ridgeley returned to Assumption and a day or two later Downs sent to the defendant a check for $10,000 in payment of the balance of the purchase price of the stock.   The note and check were both paid, and the stock was afterwards issued to Downs as agreed.

The property of the Mississippi Valley Company was not valuable as mining property.   It was worked on a small scale after Downs purchased the stock, but at a loss on every car of ore handled.   Only $3500 of the $26,000 due as purchase money was ever paid.   During the summer of 1910 the defendant made a deal with the company whereby all of the property of the company was transferred to him in consideration for services rendered, $2800 which he claimed he had advanced to the company, and an agreement that he would procure the release of the company from all liability for the $22,500 still due as part of the purchase money for which the deed of trust was given.   After this transfer was made, ''a beautiful suite of offices'' constituted the sole assets of the company.

During the period covering his ·negotiations and dealings with Downs, the defendant, in selling and at-

tempting to sell stock of the Mississippi Valley Company to people living in the vicinity of Assumption, made the same representations about the company that he was charged in the indictment with having made to Downs. On one occasion, while in Assumption for the purpose of selling the stock, he had a conversation with a witness named Burton, who was interested in the company, in which he said: "Burton, you will have to lie to sell this stock."

The evidence for the defendant tended to show the following facts:

The deed of trust for $26,000 was not executed until after the Downs note for $8000 was executed and delivered. The Mississippi Valley Company was not in fact indebted to the National Iron Mining Company, but as the claim was made that it did owe that company $26,000 on account of the purchase price of property, the board of directors concluded that it would be best to recognize the claim for that sum as valid and execute a deed of trust to secure it, which was done. The property of the company was valuable mining property and worth in the neighborhood of $500,000.

Witnesses who had known the defendant for many years, as a minister of the Gospel, a mine operator and a broker, testified that his reputation for honesty, integrity, truth and veracity was good.

The defendant testified that the note in question was executed and delivered to him in Assumption, Illinois. He denied that he ever made any representations to Downs concerning the value of the stock; that he ever represented to him that the company owned nine hundred acres of land in fee simple, or that the company was free of indebtedness or that its property was clear of incumbrance.

In his argument to the jury the assistant prosecuting attorney commented upon the fact that the defendant while on the witness stand had not denied having told Mrs. Ridgeley his wife was a disreputable woman,

and had not denied that he made false representations to certain witnesses from Assumption, in endeavoring to sell stock to them. Objections to these comments were overruled by the court, to which rulings the defendant excepted.

I. Appellant demurred to the indictment, and he now assigns as error the action of the court in overruling the demurrer.

In setting out the alleged offense the indictment denies the truth of each false pretense charged to have been made and immediately following the last pretense so negatived, separated only by a semicolon, concludes with the formal language, "Against the peace and dignity of the State." It is contended that the indictment is defective in that it does not conclude as required by the Constitution. The criticism, as we understand it, is that the concluding clause is limited to the one averment immediately preceding it, instead of referring to and modifying the entire charge. This criticism is without foundation. The Constitution requires that "all indictments shall conclude 'against the peace and dignity of the State.'" The indictment in this case does so conclude and exactly in accordance with the recognized forms and precedents in such cases. [Kelley's Crim. Law & Prac., sec. 692; Bishop's Forms (2 Ed.), sec. 418 et seq.]

The indictment is also assailed on the ground that it fails to allege with particularity the contract and agreement between the defendant and Downs, (1) as to the sale by the defendant to Downs of the 370 shares of stock referred to; (2) in that it does not allege that the stock so sold was not of the value of $8000, nor that by reason of the sale Downs was cheated and defrauded, nor that by the delivery of the note to the defendant Downs sustained injury.

A reading of the indictment, set out at length in the statement of facts herein, will show that four false

pretenses are charged to have been made: (1) that the Mississippi Valley Company owned in fee simple 900 acres of lands therein described; (2) that such lands were free and clear of indebtedness and incumbrance; (3) that said company was solvent and was not indebted to any person; (4) that the shares of the capital stock of the said company were then and there worth their par value. The indictment then, with sufficient definiteness, alleges that Downs, believing the said pretenses to be true and being deceived thereby, was induced to purchase certain shares of the capital stock of the said company and to execute and deliver to the defendant in payment therefor his negotiable promissory note of the value stated and that by means of said fraudulent representations the defendant did obtain from Downs the said note with the intent him, the said Downs, then and there to cheat and defraud. The indictment then properly negatives the truth of each false representation alleged and concludes as heretofore stated. After an examination of the indictment, we are satisfied it meets every requirement of good pleading and that the demurrer was properly overruled. [State v. Martin, 226 Mo. 538.]

II. Error is next assigned to the action of the court in admitting testimony offered by the State, over the defendant's objections. A number of adverse rulings are complained of under this head. We shall dispose of them under two groups. First, those relating to testimony concerning the statements, letters and conduct of the defendant in pretending to be desirous of marrying the widowed daughter of the prosecuting witness, but which did not directly tend to prove the charge; and, second, the rulings complained of in admitting testimony of representations made by the defendant to other persons, in selling or attempting to sell stock in the same company, after the date of the alleged offense.

It was shown that the daughter of the prosecuting witness, a widow forty-two years of age, was making her home with her father; that the defendant became acquainted with her, represented himself as wealthy, became a suitor and promised to marry her as soon as he secured a divorce from his wife, which he said would be within a few months. The father knew of the contemplated marriage of the defendant and his daughter, and on the defendant's frequent visits treated him as a member of the family. These conditions existed before and during the time the alleged false representations were being made, and we think the testimony was clearly admissible. It is evident that it was a part of the defendant's scheme to obtain the confidence of the aged father through his prospective marriage of the daughter, and the testimony of Downs leaves no doubt that he was the more susceptible to the defendant's influence by reason of that fact. As soon as the defendant secured the old man's note and money he began to suggest obstacles to an early marriage and his visits soon ceased.

In cases of this character, where such devious methods of approach are resorted to in order to allay suspicion and gain the confidence of the intended victim, a wide range in the reception of testimony must of necessity be allowed, in order that the case may be intelligently presented to the jury. In 5 Ency. of Evidence, 744, the rule is thus stated: ''All the circumstances occurring at the time of, and surrounding, the transaction in question, are matters proper to be shown for the consideration of the jury. . . . . Great latitude has been allowed in the reception of evidence bearing upon this issue. . . . The prosecution is not restricted to the exact transaction as it took place between the prosecutor and the accused, but may give evidence of acts or statements showing the steps preliminary thereto when tending to show the intent.''

The testimony tending to prove that defendant made similar representations in selling and attempting to sell stock in the same company to other persons, after the date of the crime charged, was properly admitted for the purpose of proving the element of criminal intent.   [State v. Roberts, 201 Mo. 702; State v. Wilson, 143 Mo. 334; State v. Balch, 136 Mo. 103; State v. Sarony, 95 Mo. 349; State v. Bayne, 88 Mo. 604; State v. Myers, 82 Mo. 558; 19 Cyc. 443.]   In State v. Roberts, supra, l. c. 726, discussing this subject, the court said: ''This evidence was unquestionably admissible for the purpose of showing a common fraudulent purpose and intent to cheat and defraud. . . . It may be observed, moreover, that the transaction between the said parties and Mrs. Coleman need not have occurred prior to the Tolly transaction, in order to render evidence thereof admissible, if it occurred on the same day or about the same time and tended to prove a common intent upon the part of said Roberts, Turner and Gibbs to cheat and defraud.'' We hold that the testimony complained of was competent and that the court did not err in overruling the defendant's objections thereto.

III.   It is urged that the court erred in failing to give an instruction at the close of the testimony, directing a verdict of acquittal.   This contention is based upon five grounds, namely:  (1)  That it was shown by the testimony that the note charged to have been obtained from Downs by false pretenses was not delivered to the defendant in the State of Missouri; (2) that Downs did not rely upon any representations made to him by the defendant, but investigated for himself; (3) that Downs had the means at hand of detecting whether the alleged representations were true or false; (4) that the representation as to the value of the stock sold to Downs was absurd and not calculated to deceive; (5) that there was no evidence that

Downs was defrauded by the sale of the 370 shares of stock to him.

The instruction was properly refused and (answering appellant's contentions in the order stated) for the following reasons:

(1) The testimony was conflicting as to whether the note was delivered to the defendant in this State. Downs and his daughter both testified that it was executed and delivered in the Terminal Hotel in the city of St. Louis, while the defendant testified that it was delivered in the State of Illinois. The question therefore was one of fact for the jury and not a question of law for the court.

(2) Although Downs, at the defendant's suggestion, did personally view the real property of the Mississippi Valley Company, such investigation was incomplete and evidently gave him but little information as to the matters concerning which the false pretenses were charged, and he testified that he relied upon the representations made to him by the defendant. That testimony was sufficient to take the case to the jury upon such issue. "It is not necessary to conviction that the false pretenses should be the sole inducement to giving the credit or parting with the property; it is enough if they have a controlling influence, although other minor considerations may concur." [Kelley's Crim. Law & Prac., sec. 694.] In Underhill on Crim. Evidence (2 Ed.), sec. 440, it is said: "Whether the representations were calculated to deceive, whether the owner relied upon them as the main inducement, and whether they were known to be false, by the accused, are questions for the jury."

(3) It is not for the defendant to say that the person defrauded might, by the exercise of vigilance, have discovered the falsity of the pretenses and thus have escaped being defrauded. In the case of State v. Starr, 244 Mo. 161, FERRISS, P. J., speaking for this court and discussing the subject in

hand, said: "One who deliberately imposes upon another should not be heard to say that his victim was over-credulous or negligent in believing what he was told. The law measures the responsibility of a defendant in such cases not by what would impose upon a man of acumen, or upon one of ordinary ability, but by what was calculated to impose upon the victim under all the circumstances of the case."

(4) The contention that the representations as to the value of the stock were so absurd and irrational in their character that the court should have decided as a question of law that they were not calculated to deceive, we think not well founded, and is sufficiently answered by the authorities cited in the last two preceding paragraphs.

(5) There was testimony tending to prove that the defendant, under the false pretenses charged, obtained from Downs the note described, also the value of the note and its payment by Downs. That was all that was necessary for the State to prove to show that Downs was defrauded. [19 Cyc. 411, and authorities cited.]

IV. It is finally urged that the assistant prosecuting attorney was guilty of such improper conduct in his argument to the jury as to constitute reversible error and entitled the defendant to a retrial of the case. The remarks, in part, are referred to in the statement of facts. Others are complained of which we have considered and found unobjectionable, and they will not be discussed.

That counsel for the State has no warrant of law to comment upon the failure of a defendant as a witness to testify upon any fact in issue or to deny any fact testified to by another witness, has been the settled law of this State since the decision in the case of State v. Graves, 95 Mo. 510. The statute upon the subject, section 5243, Revised Statutes 1909, does not in

express terms deny the right of the State to comment in argument upon the failure of a defendant, when a witness, to testify as to any fact in evidence against him; but this court has construed the statute and under the rule adopted the prosecuting attorney has no more right to comment upon the failure of the defendant to so testify than to comment upon his failure to avail himself of his right to go upon the stand as a witness in his own behalf. [State v. Ferrell, 233 Mo. 452, and cases cited.] From these views it follows that the court erred in overruling the defendant's objections to the argument based upon the failure of the defendant to deny certain facts.

The question remains, was such error prejudicial to the substantial rights of the defendant on the merits? If not, then this court is forbidden by the Statute of Jeofails to reverse the judgment and grant a new trial upon that ground.

The testimony as to what the defendant said in his pretended wooing of Mrs. Ridgeley, we have held competent. It was admissible to explain the relations of the parties and to show criminal intent. The testimony as to what he said in that connection against his wife's character was of little significance as tending to prove guilt. If he had denied it when on the stand, or had admitted it, what influence would that fact have had upon the minds of the jury? The most that can be said of the prosecutor's reference to the defendant's failure to deny is that such testimony, not being denied, was probably true. There was considerable other testimony, intermingled with the business on hand, concerning the defendant's social relations with Mrs. Ridgeley and her father, including letters written by the defendant. He did not refer to any part of that testimony when on the stand (except that in his testimony in chief he admitted writing to Mrs. Ridgeley a love letter introduced in evidence by the State and be-

ginning, "My Dear Girl"), although it showed him to be a married man with a family at the time, and as all of that stood undenied we think the comment and argument under review could not have prejudicially affected his rights and would not justify a reversal of the judgment.

What has been said in the foregoing paragraph is largely applicable to the other remarks complained of, namely, that the defendant had not denied the testimony of certain witnesses for the State as to similar representations made to them in selling and attempting to sell stock in the same company. That testimony was admitted to prove intent, and by an instruction the jury were told they should not consider it for any other purpose. In returning a verdict of guilty, the jury must have found that the false pretenses charged were made by the defendant and that by means thereof he obtained the note from Downs. These facts being found, the further fact as to the intent with which the false pretenses were made was so clearly proven that we are satisfied the reference to the defendant's failure to deny the testimony as to representations made in other sales, though error, was harmless and not such as to warrant a new trial of this case.

After a careful examination of this long record, our conclusion is that the defendant was given a fair trial and that prejudicial error was not committed against him. The judgment is accordingly affirmed.

*Brown, P. J.,* and *Ferriss, J.,* concur.