## VERNON G. DOBSON v. STATE.

No. A-9962. May 6, 1942.

(126 P. 2d 95.)

A. J. Moore, of Oklahoma City, and Frank Houston, of New Orleans, La., and A. V. Dinwiddie, of Guthrie, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and J. Walker Field, Asst. Atty. Gen., for defendant in error.

JONES, J. Defendant, Vernon G. Dobson, w a s charged in the district court of Oklahoma county with grand larceny by fraud, was tried, convicted and sentenced to serve two years in the State Penitentiary, and has appealed.

The only proposition presented by defendant which it is necessary to discuss is whether the court erred in failing to sustain the motion of the defendant to direct a verdict of not guilty at the close of all the evidence.

The defendant was charged specifically with the larceny by fraud of the sum of $300 from Moody Stamper.

The undisputed proof is that the defendant is a young man living in Oklahoma City. That he owned or had control of some trucks which were being used in hauling fruit and vegetables from the Rio Grande Valley in Texas. He had been engaged in this business for about six months prior to October 1, 1939. That in May, 1939, and continuing at various periods thereafter, until the middle of October, 1939, the defendant inserted an advertisement in the daily Oklahoman to the effect: "Partner wanted, trucking business, investment $200 required—1442½ N. W. 26th."

Moody Stamper testified that in answer to the advertisement he called on the defendant at his residence. That the defendant informed him that he was in the trucking business hauling produce from Texas to Oklahoma

City and that he had contracts and connections through which orders for trucking produce had been obtained. That he owned some trucks and needed capital with which to purchase other trucks and to pay certain state motor vehicle mileage taxes and purchase motor vehicle licenses and permits. The defendant represented he would furnish Stamper with a truck which he could drive, or have someone drive for him. That on October 7th Stamper turned over to defendant $200 in cash and signed a contract which reads as follows:

"Oklahoma City, Oklahoma

"October 7, 1939

"Profit Sharing Contract

"I, Vernon Dobson, hereby receive from Moody Stamper the sum of $200.00 for the use of which I agree to pay Moody Stamper one-fourth ($\frac{1}{4}$) and R. F. Sukow one-fourth ($\frac{1}{4}$) of the profits derived from one truck, at present a 1$\frac{1}{2}$ ton truck employed in fruit business.

"I, Vernon Dobson, will do all the buying and selling, and stand the upkeep of said truck, except the fuel which will be paid from profits.

"Any time Mr. Stamper so desires to dispose of his interest he is to give me 30 days notice, and I, Vernon Dobson, am to return Mr. Stamper his money ($200.00), or, if for any reason he be discharged from service, he will automatically receive his $200 from date of notice.

"I, Vernon Dobson, am to divide said profits after each trip.

"(Signed) Vernon Dobson
"Vernon Dobson

"(Signed) Moody Stamper
"Moody Stamper

"(Signed) R. F. Sukow
"R. F. Sukow"

That four days later Stamper gave defendant another $100 and entered into another written contract, which reads as follows:

"Commission Agreement

"Know All Men By These Presents:

"This agreement made and entered into, by and between Vernon G. Dobson, party of the first part, and Moody Stamper, party of the second part, Witnesseth:

"Whereas, the party of the first part is the Lessee of a certain Chevrolet one and one-half ton truck, more fully described as follows: 193-Model; Oklahoma License No. —; operating under U.S.D. Permit No. 445; equipped for transporting fruits and vegetables, and

"Whereas, the party of the first part does hereby employ the party of the second part as driver and helper to operate the above described truck on the following basis, to-wit:

"The said party of the first part hereby agrees to pay party of the second part for his services aforementioned, ½ of the Net proceeds, or profits, as they accrue from the operation of the aforementioed truck, as his full recompense or commission, for services rendered.

"Said ½ of the net earnings, from whatever source earned, by the above mentioned truck, shall be determined as follows: Gas, oil, meals of 2 drivers (while on duty only) together with an over-ride of Three Dollars per load, shall be deducted from gross proceeds of said load transported, the then left proceeds shall constitute the Net profits, and shall be distributed as set forth in this agreement, as the full compensation or commission for services rendered by the party of the second part.

"This agreement is based on the further stipulation that the party of the second part has loaned party of the first part the sum of Three Hundred and no/100 Dollars for which party of the first part has executed a promissory note, payable on 30 days written notice by the party

of the second part, the payment of said note automatically cancels this agreement.

"This agreement cancels, abrogates and renders any previous agreement, either written or implied, null and void.

"Witness our hands and seals this 12 day of Oct., 1939.

"Subject to assignment within 15 days.

"(Signed). Vernon Dobson
"Party of the First Part

"(Signed) Moody Stamper
"Party of the Second Part

"Witnesses:
"(Signed) J. A. Tapley
"(Signed) Millie Stamper"

Stamper further testified that defendant, at that time, gave him a note for $300 due 30 days after written demand by Stamper. That defendant did not furnish him a truck, and on October 17, 1939, Stamper, after consulting the county attorney, served a written notice on defendant demanding a return of his money. Four days thereafter defendant paid back $75, and a week later he repaid $25, but made no further payments.

Richard Sukow testified that he saw the ad placed by defendant in the newspaper; that he went with Moody Stamper to investigate the proposition offered by defendant and put up $100 of the money which was advanced by Stamper. Stamper was not physically able to drive a truck and witness was to be the truck driver. His testimony as to the agreement with defendant and the putting up of the money was substantially the same as that of Stamper.

Charley Briney testified that he answered the ad of defendant and signed a contract with him on September 12, 1939. The contract was identified and is substantially

the same as that signed by Stamper. The defendant gave witness his note for $200, due after 30 days' written demand, with 6 per cent interest after maturity. Witness further testified that after he discussed the proposition with defendant the first time he did not sign the contract, but made an investigation for several days, during which time he talked to people who had worked for defendant and had made some money out of the deal and to a filling station man, which satisfied him that defendant's proposition was good; that he returned in three or four days and signed the contract with defendant and gave him $200 as working capital. Witness further testified that defendant did furnish him a 1½ ton Chevrolet truck which another man drove, but they never did make any profit out of the operations of the truck; that he did know some other truck drivers who said they had made money out of the operations of their trucks.

James Earl Hoover testified that he read defendant's ad; that he signed a contract with defendant substantially the same as that described by Moody Stamper and advanced defendant $125; that defendant gave him a note due after 30 days written demand. That defendant never did put him to work, and, after he gave him the 30 days' notice, defendant told him that the business had gone broke. That defendant offered to give him a pickup truck, but he did not want to drive the truck as he wanted to work here in town and get one-fourth of the profits from one truck; that he never did draw any profit from his investment and never was repaid his money.

D. C. Cranfill testified that he saw the advertisement of defendant, and, after a discussion with defendant, he put up $75 in cash and furnished a 1936 Chevrolet truck. That he was to haul fruit out of the Valley with the truck. A written lease was executed between the parties, which provided as follows:

"Lease

"This Lease made this 30th day of October, 1939, by and between D. C. Cranfill, Party of the First Part, and J. A. Tapley and Vernon Dobson, Lessors, Party of the Second Part, Witnesseth:

"That said first party in consideration of the covenants and agreements hereinafter set forth does by these presents demise, lease, and let unto the second party the following described property, to wit:

"1936 Chevrolet SU Truck, Serial Number 5RD02-6813; Motor Number T6051608; Title Number A217794A; Permit Number 17970; 1939 Tag Number UE 424.

"To have and to hold the same to the Second Party from the 30th day of Oct. 1939 to the 30th day of Oct., 1940, and said Second Party agrees to pay to the first Party as rental for the above described truck a proportionate share of the earnings of said as follows:

"Two drivers are to be employed to drive said truck, one to be paid by the party of the First Part, and one to be paid by the Party of the Second Part. The Party of the second Part agrees to pay half of all expenses incurred on these trips for oil, gasoline, flats, meals, after sums so expended has been deducted from the profits made on each trip, the profits shall be divided equally, one-half to the Party of the first part, and one-half to Party of the Second Part, after each trip.

"Party of the first part and party of the second part shall pay, in equal amounts, for new tires, Motor repair and general upkeep for the said truck. These expenses shall be paid out of the net profit after all incidental expenses.

"It is further agreed that the Second Party shall not assign this lease without the written consent of the First Party, and it is also agreed that upon failure of the Party of the Second Part to comply with the terms and conditions of this Lease, and his failure to make due and proper accounting and settlement with the party of the

first part after each trip then the first party may declare this lease at an end and void.

"The First Party shall post $75.00 cash bond to the Second Party for registration of said truck under Second Party's Permit and for all liabilities incurred and for all tags and permit needs out of the State of Oklahoma.

"It is further agreed that at the end of this lease, or sooner termination thereof, the second party shall give peaceable possession of the premises to the first party in as good condition as it is now, the usual wear and tear and damage by the elements alone excepted; and upon the non payment as above set out, said first party may distrain for rent due and declare this lease at an end and void, and re-enter and recover possession and notice of such election and demand of possession are hereby waived. This lease shall not be considered renewed except by agreement of the parties.

"The covenants and agreements of this lease shall extend to and be binding upon the heirs, executors and assigns of the parties hereto.

"Witness our hands and seals the date first above written.

"D. C. Cranfill
"Party of the First Part

"J. A. Tapley
"Party of the Second Part

"By Vernon Dobson

"Witnesses:

"Joe F. Eiley

"Dot Cashion

"Witnesses:

"Hale Baldwin

"Dot Cashion"

Witness further testified that after he first talked to defendant he made an investigation for about seven days, during which time he talked to other parties who

had had dealings with defendant and who said he was all right, after which he signed the contract. That the contract which was signed was worded by both himself and Mr. Dobson after a discussion as to the terms; that defendant never repaid him the $75, although he found where the defendant had made a deposit to secure the payment of mileage taxes; that witness did not make any trips in his truck.

A. D. Baugh testified that he was interested with the witness Cranfill in his contract with defendant; that he helped Cranfill borrow the money to purchase the truck which was to be used in the hauling. His testimony corroborated the statements made by Cranfill. The witness further testified:

"Q. (By Mr. Moore, attorney for defendant) He did obtain his cab card? A. Oh, yes. Q. That was the fact the cab was properly registered to operate in Oklahoma for the purpose you are talking about? A. There was a little trouble existing at the State Capitol on that and it took an awful long time to get that cab card. Q. How long did it take? A. I don't know just how long, but we were out there with him and something was wrong, not only this, but some other registrations out there, it seems as though he had gone out there and persuaded them to issue cab cards without making the proper arrangements and he didn't keep his promise. Q. The state required him to put up $25 on each truck? A. Yes. * * * Q. This $75 when you turned it over to Dobson, you understood $25 was to pay the mileage tax? A. Yes, sir. Q. Part of this money was to go for cargo insurance? A. Yes, sir. Q. And part of it to go to expense money? A. Yes, sir."

L. A. Arnold testified that he placed $75 with defendant and signed a contract the same as was signed by other witnesses; that defendant sent him to Mercedes, Tex., under another man to haul foods, and that defend-

ant advanced him $27.50 for expenses on the trip; that he brought back a load of fruit, but never realized any profit on his trip. On cross-examination witness admitted, however, that he did receive $9.24 which represented one-half the profits on the load of grapefruit which was hauled to Oklahoma City. That he made three trips between Oklahoma and Texas; that the permits and bonds and other incidentals in connection with the truck were arranged by the defendant and he was not molested by any officers in either Texas or Oklahoma in connection with the operation of truck. Witness further admits receiving from defendant $40 on one occasion and $50 on another occasion in connection with the trips he made. Witness further testified that he originally put up $150 with defendant, but defendant gave him back $75 and made him a note for the other $75. Witness never has asked defendant to repay him the $75.

This was all of the evidence offered by the state.

On behalf of the defendant, the following witnesses were offered.

J. W. Mosey testified that he made a contract with defendant in June or July, 1939, in which he put up $150 and was to get one-fourth of the net earnings of a truck; that he drove the truck to Arkansas, Kansas, and New Mexico. That he worked on three different trucks of defendant—a Dodge, a Chevrolet and an International. Witness signed a contract with defendant substantially the same as that signed by the witnesses for the state. Witness never made a demand on defendant to pay the note for $150, but defendant had paid him $45 on the note. The defendant did make a profit on the trips which he made. In refutation of the statement made by the prosecuting witness that he was never furnished a truck by

defendant, in accordance with the contract, Mosey testified:

"Q. (By Mr. Moore, attorney for defendant) Now, Mr. Mosey, do you know the prosecuting witness, Moody Stamper? A. I know him when I see him; I have never been introduced to him, just know him when I see him. Q. Do you know whether or not Mr. Stamper had an opportunity to make a trip? A. He did. Q. Did he make it? A. No, sir. Q. Did he refuse? A. I know the truck was held for four hours to make the trip and he showed up the next morning. Q. And they sent the truck on? A. Yes, sir. Q. After waiting four hours? A. Yes, sir."

Audry McCully testified that he entered into a contract with defendant in April, 1939, and worked about eight months. His agreement was the same as that made by the other witnesses. He averaged two or three trips a week during the eight months period he worked. That he made a profit out of the hauling which he did and received $100 of his money back from the defendant. That the fruit business became unprofitable in the fall, and when everyone decided to quit and demand their money back at the same time that defendant went broke and could not pay his debts.

Don Walker testified that he made a contract with defendant in May, 1939, in response to an ad in the paper; that he made a personal investigation of defendant before advancing any money, after which he put up $125 with defendant and signed a written partnership contract. That he operated a truck for four or five months between Oklahoma and Texas hauling fruits and vegetables. That the trips which he made were "fairly profitable." That he withdrew from the business in August, at which time it was going along in good shape. When he quit the business he made a written demand for repayment of his money and defendant paid him back the money which he had advanced. That defendant "took care of

the mileage tax, bond and stuff like that." That occasionally when he was out on the road he had to wire the defendant for expense money, which was promptly sent to him. Witness gave some names of other parties who had worked during the period he had worked for defendant who had made a living out of their work.

Charles Ollie Bass testified that he put up $100 with defendant and entered into a written partnership contract with him. That he made several trips to Texas hauling fruits. That he would take his load to the Fuller Fruit Company at Tulsa. That he continued hauling under his agreement with defendant for about t h r e e months, during which time he made a little profit. He further testified that he worked until the business went broke. That the business turned out to be unprofitable and went broke through no fault of defendant. That he never received back any part of the $100 which he advanced, but that on all trips made by him the defendant furnished the expense money; that credentials and everything necessary in the operation of the truck were in proper order and furnished by defendant.

J. W. Mosey, recalled as a witness, testified that defendant sent him to Texas when the business commenced to fail to find out what was wrong. He testified:

"Q. (By Mr. Moore, attorney for defendant) Mr. Mosey, did Mr. Dobson send you to Texas shortly before the business failed? A. Yes, sir. Q. What was the purpose of your trip down there? A. The purpose was to find out what was going on down there, Brown & Williamson canceled the contract they had and there were not enough work for the trucks and I went down to investigate. * * * Q. What was the result of your investigation, what did you find out? A. I found out Brown & Williamson had been giving the boys some work and they didn't give the boys enough work and I went down and Mr. Tapley had been there previously and they gave him

instructions as to what he could do with the trucks and that is about all I could do with him. Q. Did the business fall off? A. Yes, sir. * * * Q. Now, I think you testified yesterday you made numerous trips between here and Texas yourself? A. Yes, sir. Q. You picked up a cargo of vegetables and would bring them back here? A. Yes, sir. Q. What disposition did you make of your load when you arrived back in Oklahoma? A. The driver of the truck made those generally and turn them over to Mr. Dobson. Q. Do you know where these commodities were sold? A. Some in Oklahoma City and some in Tulsa."

Mrs. Alta Dobson, mother of defendant, testified that she was familiar with her son's trucking business. That at times the market would drop and he would lose on a load of fruit and she would furnish him money to help pay his bills. That when the men commenced demanding their money back she borrowed $650 from the First National Bank at Guthrie and furnished it to defendant to try to save his business for him. While this witness was testifying the court took a recess of 15 minutes to enable the assistant county attorney to call the bank at Guthrie to investigate the truthfulness of the witness's statements. When court convened, the assistant county attorney was placed on the witness stand by defendant and he testified that he called the First National Bank at Guthrie and they said Mrs. Dobson borrowed $650 on November 6, 1939, and placed it in an account used by the defendant and that the money had all been withdrawn.

In rebuttal, the state introduced several contracts identical in wording with those hereinabove described by other witnesses, which contracts were furnished to the county attorney's office by the defendant at the time an investigation was made of defendant's activities, before charges were filed against him.

It is insisted by counsel for defendant that the proof of the state and defendant, when considered as a whole,

shows conclusively that the defendant has committed no crime. However, it is further contended that if the view of the evidence as taken by the state should be assumed as correct, the defendant would not be guilty of larceny by fraud but would be guilty of either embezzlement or obtaining money by false pretenses.

To constitute larceny by fraud, the taking must be accomplished by the party charged from the owner of the property, in which the owner voluntarily parts with possession only, but retains the right of property in the subject-matter, and the design to convert the property to the permanent use of the taker, or someone else, must be active at the time of the taking. The owner must part with possession of the property alone, reserving the ownership therein, and the possession must be fraudulently obtained with the then intent on the part of the person taking it to convert it to his own or another's use in order to constitute the offense of larceny. If the owner parts with the possession and title, due to the deception and artifice of the taker, then the offense constitutes obtaining money under false pretenses, and not larceny by fraud. McKinney v. State, 19 Okla. Cr. 94, 198 P. 108.

In 32 Am. Jur., Larceny, § 7, p. 893, it stated:

"The distinction (between larceny by fraud and obtaining property by false pretenses) is a very nice one in many instances, and in some of the old English cases the difference is more artificial than real, resting purely on technical grounds. The character and nature of the crime depend on the intention of the parties. The intention of the owner not to part with his property when relinquishing possession is, in this class of cases, the gist and essence of the offense of larceny and the vital point on which the crime hinges and is to be determined. The correct distinction in cases of this kind seems to be that if by means of any trick, fraud, or artifice the owner of property is induced to part with the possession only,

still meaning to retain the right of property, the taking by such means, where the requisite felonious intent is present at the time, will amount to larceny; whereas, if the owner parts with not only the possession of the goods but the right of property in them also, the offense of the party obtaining them will not be larceny, but the crime of obtaining goods by false pretenses. Primarily, therefore, the nature of the offense in a particular case where possession of goods or money is obtained by fraud is determinable by solution of the question whether the owner, in parting with possession, intended to part with his title also. Accordingly, one test for distinguishing between larceny and obtaining property, other than money, by false pretenses is said to be whether the offender can confer a good title an another by the sale and delivery of the property. If he can, the crime is obtaining property by false pretenses. If he cannot, the crime is larceny."

After carefully reviewing the testimony in this case, we are of the opinion that the evidence wholly fails to support a conviction of larceny by fraud. It may possibly be that under the state's theory of the case the defendant is guilty of obtaining property by false pretenses. It is not necessary in this opinion for us to decide that question. The proof is undisputed that Stamper parted with the possession and title to the money which he delivered to the defendant. Both parties recognized this fact by the making of a note for the money given to the defendant and delivery by the defendant of the note to Stamper and its acceptance by him. The note evidenced the indebtedness owed by the defendant to Stamper. The prosecuting witness transferred the possession and title to the money which he delivered to defendant. He was loaning defendant the money in order to engage in what the witness thought would be a profitable enterprise. If the money was advanced by Stamper because of artifice and false representations made by Dobson, the defendant

would be guilty of obtaining money by false pretenses, but not of larceny by fraud as no right of property was reserved in the money which was advanced by Stamper. The county attorney apparently recognized that no crime had been committed at the time Stamper first complained to him about the transaction as he required Stamper to give the 30 days' notice to the defendant for repayment of the money before the instant action was commenced. If the defendant was guilty of larceny by fraud it had already been perpetrated at that time and the 30-day demand for repayment of the money delivered by Stamper to the defendant would not change the nature of the crime.

A consideration of the evidence in connection with the written contract entered into between Stamper and Dobson does not disclose any misrepresentations in the contract.

There are undisputed facts which definitely show that the defendant was the owner or in control of several trucks and that he had for several months during the year 1939 been engaged in the hauling of fruit and produce from various states into Oklahoma in these trucks. Many of the witnesses who testified admitted that the business as proposed by the defendant would have been profitable if the fruit and vegetable market in Texas had not collapsed through no fault of the defendant. Some of these men lost the money which they had delivered to the defendant, but they did not even demand the return of this money for the reason, as some of them testified: "I knew he didn't have the money and there was no use to ask for it. It wasn't his fault the business went broke." According to the witness Mosey, defendant Dobson had the truck described in the contract with Stamper available for the use of Stamper and held it for four hours one

morning waiting for Stamper or someone authorized by Stamper to appear and drive the truck.

The trial judge was exceedingly fair in all of his rulings on the admission or rejection of evidence and he gave every instruction requested by the defendant. While the court did not specifically instruct the jury to return a verdict of not guilty, the instructions which he gave, if followed, would have accomplished that result. The trouble lies in the fact that the jury wholly disregarded the instructions of the court. The error of the court occurred when he submitted the question to the jury for their determination of the question of fact as to whether larceny had been committed, as we find that a review of the whole record wholly fails to establish the guilt of the defendant of the crime charged in the information. This court would have to supply some of the elements of the crime by guesswork and supposition before the conviction herein could be sustained. It is unfortunate that Stamper and some of the other parties lost money on this enterprise in which they engaged, and the defendant may have concocted a nefarious scheme to defraud them of their money, but the proof fails to establish this contention.

In the case of Kirk v. State, 39 Okla. Cr. 44, 263 P. 170, 171, it is stated:

"Where the evidence raises a mere suspicion, or, admitting all that it tends to prove, the defendant's guilt is left doubtful or dependent upon mere supposition, surmise, or conjecture, the court should advise the jury to return a verdict of acquittal."

For the reasons hereinabove stated, the judgment of the district court of Oklahoma county is reversed.

BAREFOOT, P. J., and DOYLE, J., concur.