Jack LAZAR, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–11973.

Criminal Court of Appeals of Oklahoma.

Sept. 29, 1954.

As Amended on Denial of Rehearing
Nov. 10, 1954.

J. B. Dudley, Dudley, Duvall & Dudley, Oklahoma City, Clyde F. Ross, Okemah, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

The plaintiff in error, Jack Lazar, hereinafter referred to as defendant, was charged by information filed in the district court of Okfuskee County with the crime of "obtaining property by trick or deception, .by false or fraudulent representations and statements, and by the use of false and bogus instruments in violation of Section 1541 of Title 21 of Oklahoma Statutes of 1951"; was tried before a jury, convicted, and the jury assessed the penalty at imprisonment in the State Penitentiary for a term of four years, and the payment of a fine of $500. Appeal has been duly perfected to this court.

The issues raised by the assignments of error may perhaps be more readily understood by first quoting at length the information and statute involved. The pertinent portion of the information reads:

" * * * that Jack Lazar did, in the county of Okfuskee, and in the State of Oklahoma, on or about the 8th day of August, 1951, and anterior to the presentment hereof, commit the crime of obtaining property by trick or deception, by false or fraudulent representations and statements and by the use of false and bogus instruments in violation of Section 1541 of Title 21 of Oklahoma Statutes of 1951, in the manner and form as follows, to-wit: That one Jack Lazar, then and there unlawfully, knowingly, and feloniously with a premeditated intent and design on his part to cheat and defraud the said J. L. Bradley, obtained from the said J. L. Bradley on said date a stock of goods located at 216 West Broadway in the town of Okemah, Okfuskee County, Oklahoma, in the building known as Bradley's Store, said stock of goods was of the reasonable cash value of $10,500.00, good and lawful money of the United States of America, by means and use of a certain trick and deception and felonious and fraudulent representations and statements and pretenses and instruments and devices by what is commonly called the 'confidence game', as defined by section 1541 of Title 21 Oklahoma Statutes, 1951. The said defendant knowing at the time that his representations were false, untrue and fraudulent and made for the purpose and with the intent on his part to cheat and defraud the said J. L. Bradley of his said stock of goods on the said 8th day of August, 1951, made, executed and delivered to the said J. L. Bradley a note and chattel mortgage securing the same, a copy of said mortgage being attached hereto and marked 'Exhibit A' and made a part hereof. That said mortgage was void and was known to be void by the defendant at the time he executed the same as to the stock of merchandise, and was a fraudulent, fictitious instrument, and the defendant by use of such false and fraudulent representations to the said J. L. Bradley as a part of his confidence game or plan to obtain said property, he, the said Jack Lazar, represented to the said J. L. Bradley that he was the president and owner of Wilmore's Department Store in Oklahoma City, Oklahoma; that he had a Dun-Bradstreet credit rating of $200,000.00; that he had three buying offices in the city of New York; that he owned a blouse factory, and that said written mortgage was valid mortgage which would cover said stock of goods all of said representations and statements were then and there known by the defendant to be false and fraudulent and were made for the purpose of obtaining the confidence of J. L. Bradley and inducing him to have confidence in the said Jack Lazar, and for the purpose of obtaining said stock of goods, the property of the said J. L. Bradley, by the defendant Jack Lazar, contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State."

The pertinent portion of Tit. 21 O.S.1951 § 1541 reads:

"Every person who, with intent to cheat and defraud, shall obtain or attempt to obtain from any person, firm or corporation, any money, property, or valuable thing, of the value of Twenty ($20.00) Dollars, or less, by means or by use of any trick or deception, or false or fraudulent representation, or statement or pretense, or by any other means or instrument or device commonly called the 'confidence game', or by means or use of any false or bogus checks, or by any other written or printed or engraved instrument or spurious coin, shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine not to exceed One Hundred ($100.00) Dollars, or by imprisonment in the county jail for not more than thirty (30) days, or by both such fine and imprisonment. If the value of the money, property or valuable thing referred to in the preceding paragraph, be more than Twenty ($20.00) Dollars, any person convicted hereunder shall be deemed guilty of a felony and shall be punished by imprisonment in the State

Penitentiary, for a term not exceeding seven (7) years, or by a fine not to exceed Five Hundred ($500.00) Dollars, or by both such fine and imprisonment."

The statute then defines "false or bogus check" and the word "credit", but the language "or by any other means or instrument or device commonly called the 'confidence game'" is not further defined.

Counsel urges that the statute is indefinite, uncertain and confusing, and violates Art. II, § 20 of the Constitution of the State of Oklahoma, and the Fifth and Sixth Amendments to the Constitution of the United States, and is void.

This specification of error was properly raised in the trial court by demurrer to the information, and also in the motion for new trial.

In support of this proposition, it is stated that "(A) Said section fails to set up ascertainable standards so that men of common intelligence are not required to guess at its meaning either as to persons within the scope of the act, or as to the applicable test to ascertain guilt. (B) Said section is so vague, indefinite, uncertain and confusing that men of common intelligence must guess as to what conduct on their part will render them liable to its penalties."

It is apparent that the opening portion of the sentence found in Art. II, § 20 of the Oklahoma Constitution, reading: "He [the accused] shall be informed of the nature and cause of the accusation against him and have a copy thereof * * *" is the portion of the Article of the Constitution it is claimed was violated. The substance of the pertinent portion of this sentence appears in the Sixth Amendment to the Constitution of the United States. No doubt the Fifth Amendment was cited by

reason of that clause providing that no person shall be deprived of life, liberty or property, without due process of law.[1]

We do not find where the issue raised has ever been considered by this court, although we have construed the Act in question as to the term "false or bogus check", and as to the word "credit". Gunther v. State, 42 Okl.Cr. 129, 276 P. 237; and in Rucker v. State, 88 Okl.Cr. 15, 195 P.2d 299, 199 P.2d 221 have defined the term "confidence game", following the definition given in People v. Gould, 363 Ill. 348, 2 N.E.2d 324; People v. Shaw, 300 Ill. 451, 133 N.E.2d 208, and Clark v. State, 53 Ariz. 416, 89 P.2d 1077.

■ In approaching the problem presented, we must keep in mind the fundamental and general rule many times announced by this court that every presumption must be in favor of the constitutionality of an act passed by the Legislature, and one attacking the constitutionality must make out a clear case as to the unconstitutionality. Ex parte Hunnicutt, 7 Okl.Cr. 213, 123 P. 179; In re Ambler, 11 Okl.Cr. 449, 148 P. 1061; Bishop v. City of Tulsa, 21 Okl.Cr. 457, 209 P. 228, 27 A.L.R. 1008; Ex parte Davis, 66 Okl.Cr. 271, 91 P.2d 799; State ex rel. Hudson v. Carter, 167 Okl. 32, 27 P.2d 617, 91 A.L.R. 1497. See also Morton v. People, 47 Ill. 468; People v. Adduci, 412 Ill. 621, 108 N.E.2d 1; 11 Am.Jur. p. 776.

The clause "by any other means or instrument or device commonly called the 'confidence game'" appears in the statutes of a number of states and the constitutional question here raised has received consideration many times. A leading case is that of Morton v. People, supra.

It appears that the Legislature or General Assembly of Illinois on February 27, 1867,

---

1. See Maxwell v. Dow, 176 U.S. 581, 20 S.Ct. 448, 451, 44 L.Ed. 597, 599, where the Supreme Court of the United States, through Justice Peckham, said: "In order to limit the powers which it was feared might be claimed or exercised by the Federal government, under the provisions of the Constitution as it was when adopted, the first ten amendments to that instrument were proposed to the legislatures of the several states by the first

Congress on the 25th of September, 1789. They were intended as restraints and limitations upon the powers of the general government, and were not intended to and did not have any effect upon the powers of the respective states."

But see McNabb v. U. S., 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, and Upshaw v. U. S., 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100.

passed an act entitled, "An Act to define and punish the crime commonly called the 'confidence game'", and in the first section the game is defined to be the obtaining or attempting "to obtain from any * * * person or persons any money or property, by means or by the use of any false or bogus checks *or by any other means, instrument or device, commonly called the 'confidence game'*". Laws 1867, p. 88, S.H.A. ch. 38, § 256. (Italics supplied.)

In the indictment it was charged that the accused obtained from one Daniel Hughes one certain Treasury note and certain bank notes of certain value, etc., and it was then simply stated, *"by means of the confidence game,* contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the people of the State of Illinois."

It was urged "that the indictment does not set out the elements constituting the offense, and that the second section of the Act is in violation of section 9 of Article 13 of the Constitution of the State."

The section of the Illinois Constitution referred to provided: "In all criminal prosecutions the accused has the right to be heard by himself and counsel; *to demand the nature and cause of the accusation against him,* etc." It will be seen that the italicized portion of Art. II, § 20 of the Oklahoma Constitution, heretofore quoted, is substantially the same as the italicized portion of the Illinois statute above quoted.

The court in considering the clause "by any other means or instrument or device commonly called the 'confidence game,'" in part said:

"Now, as these devices are as various as the mind of man is suggestive, it would be impossible for the legislature to define them, and equally so, to specify them in an indictment; therefore the legislature has declared, that an indictment for this offense shall be sufficient if the allegation is contained in it that the accused did, at a certain time and place, unlawfully and feloniously obtain or attempt to obtain the money or property of another by means and by use of the confidence game, leaving to be made out by the proof the nature and kind of the device to which resort was had.

\* \* \* \* \* \*

"The nature and character of the so-called confidence game, has become popularized in most of the cities and large towns, and even in the rural districts, of this broad Union, and is well understood, and this defendant was distinctly apprised by the indictment of what he was called upon to defend. The accusation is sufficiently identified by the name of the victim. This name must appear in every indictment on this statute, and appearing there, no second indictment for the same offence could be successfully prosecuted. The conviction on this indictment could always be pleaded in bar of a second.

"We are of opinion that the offence is so set forth in the indictment that the accused can be at no loss to know what it is with which he is charged, and can so prepare his defense; that he cannot be charged with one offence and arraigned for another and different offence, and that he cannot be tried again for the same offence, it being so distinctly specified in this indictment as to enable him if again charged with the same offence to plead this judgment in bar.

"As to the constitutional objection, some of the cases referred to by the plaintiff in error may go to the extent claimed, but as we have a very scrupulous regard for the acts of a co-ordinate department of the government, whose exclusive duty it is to make laws, we cannot declare any enactment of that department null and void as being against the constitution, unless we are fully convinced of the violation. We are not so convinced, and therefore must uphold the law."

See also Maxwell v. People, 158 Ill. 248, 41 N.E. 995; Graham v. People, 181 Ill. 477, 55 N.E. 179, 47 L.R.A. 731, and

People v. Brady, 1916, 272 Ill. 401, 112 N.E. 126, affirming the constitutionality of the act. Of interest, see Collins v. Traeger, 9 Cir., 27 F.2d 842, 846.

In People v. Martin, 1925, 78 Colo. 200, 240 P. 695, the Supreme Court of Colorado held constitutional an Act, C.L.1921, § 6856, similar to the Illinois Act, and bottomed on the reasoning and interpretation of the Supreme Court of Illinois in Graham v. People, supra, and cases there cited.

The State of Missouri in 1879 adopted statutory provisions, R.S.1879, § 1561, covering cheats, frauds, bogus checks, etc., which contained the "confidence game" clause that we are now considering. The first sentence of the Act now appearing as Section 4694, Mo.Rev.Stat. Ann., V.A.M.S. § 561.450, is practically the same wording as when originally enacted, but the second sentence of the original act, reading: "In every indictment under this section, it shall be deemed and held a sufficient description of the offense to charge that the accused did, on ⸺, unlawfully and feloniously obtain, or attempt to obtain (as the case may be) from A. B., (here insert the name of the person defrauded) his or her money or property by means and by use of a cheat, or fraud, or trick, or deception, or false and fraudulent representation or statement, or false pretense, or confidence game, or false and bogus check, or instrument, or coin or metal, as the case may be, contrary to the form of the statutes," etc. was omitted from the Act of 1909. This second sentence in all essentials was a copy of the Illinois Act and the same as now appears in the Colorado Act.

The first part of the section had declared the crime, and the last part declared what should be a sufficient charge in the indictment. In a number of cases, including State v. Fancher, 1880, 71 Mo. 460; State v. McChesney, 90 Mo. 120, 1 S.W. 841; State v. Horn, 93 Mo. 190, 6 S.W. 96, and State v. Sarony, 95 Mo. 349, 8 S.W. 407, the Supreme Court of Missouri held the original Act constitutional, but in 1892 in the case of State v. Terry, 109 Mo. 601, 19 S.W. 206, by a divided court it was decided that the second sentence of the Act, quoted above, by reason of dispensing with the details of the offense (in the indictment or information) violated Const. Art. II, § 22, which declares that "the accused shall have the right * * * to demand the nature and cause of the accusation".

The Terry case was in 1893 approved in State v. Cameron, 117 Mo. 371, 22 S.W. 1024, and thereafter in State v. Kain, 118 Mo. 5, 23 S.W. 763. Cases of interest since the omission of the second sentence from the Act and that consider the sufficiency of the information are State v. Wilson, 1909, 223 Mo. 156, 166, 122 S.W. 701, 704, and State v. Block, 1933, 333 Mo. 127, 129, 62 S.W.2d 428. See also annotations to Section 4694, Mo.Rev.Stat.Ann. In the Wilson case the court, in the body of the opinion, said [223 Mo. 156, 122 S.W. 704]:

"* * * the purpose of this statute was to provide for a class of false representations not included in some other section dealing with the subject of the ordinary false representations. It was intended to reach a class of offenders known as 'confidence men,' who obtain the money of their victims by means of, or by the use of, some trick or representation designed to deceive. The very essence of the crime denounced by section 2213 [V.A.M.S. § 561.450] is that the injured party must have relied upon some false or deceitful pretense or device and parted with his property."

About the only material difference between the Louisiana statute, Act No. 43 of 1912, LSA–R.S. 14:67, covering the "confidence game" is that in the form prescribed for the indictment it is required that the "manner in which he [the complainant] was defrauded". In State ex rel. Kavanaugh v. Mitchiner, 1943, 204 La. 415, 15 So.2d 809, the Supreme Court of Louisiana held the Louisiana Act constitutional. The proposition now urged here was urged there. It had previously received attention in State v. Theriot,

1916, 139 La. 741, 72 So. 191, L.R.A. 1916F, 683, and State v. Courreges, 201 La. 62, 9 So.2d 453, 455.

The Oklahoma Act, Tit. 21 O.S.1951 § 1541, declares the crime but does not attempt to prescribe what should be a sufficient charge in the indictment or information.

■ In common with the courts of last resort in Illinois, Colorado, Missouri and Louisiana, it is our conclusion that the nature and character of the so-called confidence game, has become popularized throughout the nation, and is well understood, and is sufficiently clear to inform the general public or any person charged with the offense of its nature and the means through which it may be perpetrated. And we hold constitutional Tit. 21 O.S.1951 § 1541, as against the contention that it is violative of Art. II, § 20 of the Oklahoma Constitution, or any applicable Federal constitutional provision.

■ As to the sufficiency of the information, we find that it sets forth a statement of the acts constituting the offense, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended, and is direct and certain as to the particular circumstances of the offense charged, and the essential facts are so specifically stated that the judgment in the case will be a complete defense to any subsequent prosecution for the same cause. We therefore hold it sufficient, and that the court did not err in overruling the demurrer filed against it. See Rucker v. State, supra, Art. II, § 20 of the Okla.Const., Tit. 22 O.S.1951 §§ 401, 402, 409(6).

■ The argument that the prosecution should have been based on Section 1701, instead of Section 1541, of Title 21 O.S.1951, is not tenable for the reason that Section 1701 is the statute on larceny, and the distinction between obtaining property by fraud and obtaining property by false pretenses is the intention of the owner not to part with title to his property when relinquishing possession. Dobson v. State, 74 Okl.Cr. 341, 126 P. 2d 95. The facts in the within case show that the owner executed and delivered to the defendant a bill of sale and received therefor a note and mortgage. The vital points here involved are the circumstances surrounding the transaction between the parties, the representations made to the seller by the defendant, etc.

It is insisted that the judgment is contrary to law, is not supported by the evidence, and that if the defendant committed the offense charged, the prosecuting witness Bradley was an accomplice thereto and that there is no evidence corroborating his testimony.

This requires a rather minute consideration of the evidence which on the part of the State developed that J. L. Bradley had been engaged in the dry goods business for about 27 years, 15 years of which was at Okemah; that he had decided to retire; that he placed an ad in the Daily Oklahoman in July, 1951 offering his store for sale; that Jack Lazar, the defendant, came to his store along with Irving A. Polin and James E. Turner on August 7, 1951; that Mr. Lazar introduced himself and stated that he was owner and president of Wilmor's Department Store in Oklahoma City, and that he wanted to purchase the Bradley store; that witness in response to his ad had previously received a letter from defendant, written on the Wilmor Department Store's stationery. This latter point was developed on cross-examination.

J. L. Bradley further testified:

"A. He said, 'I am president and owner of the Wilmor Department Store, and I am buying in some outlet stores; I have an out-let store at Okmulgee; I already have a building rented in McAlester and in Ada, and if I buy your store, I will have stores at Okmulgee, McAlester, Ada, Okemah; and back in Oklahoma City, it will make a nice out-let for the store—we have such a large buying power, it will make a nice out-let for our store in Oklahoma City.' He mentioned what his buying power was and he could sell merchandise so

cheap, and asked me if I had seen their ads running in the Oklahoma City papers on their store in Oklahoma City, and I told him I had.

"Q. What else did he tell you? A. He told me he owned a blouse factory back east. 'We specialize in ladies' ready-to-wear; our buying power is so that we feel like we can undersell anybody.'

"Q. What else did he mention to you or tell you at that time? A. Well, we went ahead and had quite a little lengthy conversation.

"Q. Tell the jury what he said. A. He asked me what I wanted for it, and I told him that I would take $11,000 for the stock and fixtures and the way the stock inventoried and the merchandise that I had bought, that I was figuring it on the basis of seventy-five cents on the dollar and he was allowing $500 in that transaction for the fixtures.

"Q. All right. A. So he told me, 'I will pay you $500 down and give you six per cent interest on this balance of $10,500, and pay you $500 a month, and at all times I will keep a stock inventory—$25,000 stock of merchandise in here at all times.'

\* \* \* \* \* \*

"Q. What else did he tell you? A. Mr. Turner, he introduced him to me as his shoe buyer—this man over here (indicating)—I know he had a mustache—Lazar came in the store first and he came in later, and he introduced this Turner as his shoe buyer for his different stores. Later he introduced me to this other fellow as his piece-goods buyer for his Wilmor Department Store and other stores that he was buying in as outlet stores."

Witness further testified that the deal was made in the Okemah store but they went to the Citizens State Bank and had the note and mortgage made out, and the secretary of the Bank prepared the note and mortgage; that defendant took the instruments to Oklahoma City to get his wife, Bertha Lazar, to sign, but witness gave Mr. Lazar a bill of sale to the store the 7 August, 1951, and $60 that was in the cash register, and received a check for the down payment of $500; that Jack Lazar later brought the note and mortgage back from Oklahoma City and stated the signature "Bertha Lazar" was made by his wife. Witness stated that he had the mortgage recorded and left for a trip to Missouri, but returned on August 23, and found that defendant had a big sale advertised for the store. The ad shown to have been running in the Okemah Daily Leader was received in evidence and read, in part:

"Bradleys Quit! Quitting Business Sale. After 15 years of pleasant business relationship with many friends and customers in Okemah, we have decided to quit business. Our entire stock must be sold. Every piece of merchandise has been drastically reduced for quick clearance."

Witness stated that he contacted the defendant and protested to him that he did not want his name on any advertising in that he had sold out to him. Witness further stated that when he sold the store to the defendant that he had told him that he was going to put a big Wilmor sign on it.

Witness testified that on or about December 5 he was in the store and found four or five cases of merchandise ready for shipment and was told that the cases were being shipped to the Okmulgee store; that he became apprehensive and made a trip to Okmulgee and then to Oklahoma City and found out that defendant did not own the Wilmor Department Store, that he only owned a little department in it called "Kiddy Land"; that defendant's store in Okmulgee was called "Jay's"; and he found crated boxes of merchandise in the Okmulgee store addressed to "Leah's Store, Dallas, Texas" in care of Swart's Department Store; that he saw shoes on the shelf that had belonged to him over at Okemah—Star Brand shoes, and Williams shoes; that his cost mark was still on them. He testified that he found 60

pairs of shoes from the Okemah store in defendant's department at Wilmor's in Oklahoma City. That soon thereafter he found defendant at the Okemah store and witness stated: "I told Mr. Lazar he was shipping merchandise out of the store that I had a mortgage on, and I would sue him, and he said, 'That mortgage isn't any good; I will do whatever I want to do with those shoes or anything else in this store'; and he said, 'Go consult a lawyer'". Witness further stated: "At that particular time he said, 'I knew the mortgage wasn't any good at the time I gave it to you, and you may think I was pretty dumb, but I think you will find out I am a pretty smart operator.'" Witness stated that he then telephoned an attorney in Oklahoma City and went there, and consulted him as to the validity of the mortgage; that thereafter defendant failed to make a payment on the note and he went to see defendant in Oklahoma City and he found some of the shoes from the Okemah store in defendant's department at the Wilmor store; that witness filed suit against defendant, but was enjoined from proceeding by Federal Court order by reason of involuntary bankruptcy proceedings against Lazar; that defendant made six $500 payments on the note.

Witness further testified that in January defendant had conducted a second sale at the Okemah store, advertised in the Okemah Daily Leader, which advertisement read in part:

"IT's Not War—It's Murder! Ordered Sold at Once, Regardless of Cost or Selling Price—Jay's Department Store."

On cross-examination witness Bradley denied that he discussed the sale with the two men who accompanied Lazar to his store. He admitted that all three went to a cafe and drank coffee, but stated that the sale was not agreed upon at the cafe. "Q. While you were there, the topic of conversation was all about the business at hand, was it not? A. It was mostly about Wilmor's Department Store at Oklahoma City, the volume of business they were doing, and the amount of merchandise they were selling and turning. And I had been in the Wilmor Department Store—it was about three stories high." He stated that he did not consult an attorney about the deal, he only went to inquire of his wife if it was satisfactory with her that he sell.

Witness admitted that defendant had told him that when goods were not salable at one store, he would take them to another store, but stated that defendant said he would supply most of his stores out of the Oklahoma City store,—McAlester, Okmulgee, Ada and Okemah. He did not know of his own knowledge whether more goods had been sent in than taken out. Witness did not know of his own knowledge whether the two men who came with defendant the day of the sale were actually associated with him or not. He stated that he believed Lazar was telling him the truth, that he had taken out his billfold and had identified himself as being affiliated with the Masonic order. Witness admitted that he had a number of "cuss fights" with defendant, and told him: "Lazar, I wouldn't have thought you would have come in here and told me you owned Wilmor's Department Store and was putting in all these stores."

Witness on re-direct examination testified that he was present at the bankruptcy hearing in Oklahoma City and heard defendant testify and admit that he had been in bankruptcy three previous times, and under different names. Witness swore that he would not have delivered his stock of goods and bill of sale to the defendant if he had not believed the mortgage was good and if he had not believed defendant's statements concerning his credit and buying power.

Richard D. Hall of the O. C. & E. Motor Freight Lines identified delivery slips showing the shipment of various cartons of merchandise from the Okemah store to Jay's Department Store, Okmulgee, and to Leah's Shoe Department, 431 West Main, Oklahoma City (the location of Wilmor's Department Store).

Fred Ratterree, vice president and cashier of the Citizens State Bank, Okemah, testified to the defendant withdrawing funds from the Okemah store account December 26, 1951, and purchasing an $1,800 cashier's check, and that the check was paid December 31, 1951; that he tried to borrow money from the Bank; that he

authorized witness to pay from his account $500 each month on the Bradley note and that he did so as long as there was sufficient funds in the account and made six payments of $500 each.

Paul G. Darrough, Referee in Bankruptcy, Oklahoma City, testified and identified a financial statement executed on July 14, 1951, and given the Central State Bank, Oklahoma City, in which defendant listed his liabilities at $15,115, and his assets at $42,615, and witness stated that defendant Lazar admitted the signature to the statement was his.

Irving A. Polin testified for the defendant, and said that he lived in Dallas, Texas; that on August 7, 1951 he came with Jack Lazar and a Mr. Turner to Okemah, Lazar being interested in purchasing a stock of dry goods from J. L. Bradley. He claimed that the conversation with Bradley was "four cornered" and that he heard it all. He denied that Lazar ever told Bradley that he was owner and president of the Wilmor Department Store in Oklahoma City, but told him that he owned the Kiddy Land Department in that store; claimed that he was within ten feet of Lazar and Bradley during the negotiations that resulted in the sale; denied that Lazar told Bradley that he had a $200,000 rating with Dun & Bradstreet; denied that Lazar told Bradley that he owned a blouse factory in the east, but said that Lazar did tell him that he wanted the store as an outlet for his other stores and told him that he had three buying offices in New York; but denied that Lazar told Bradley that the mortgage he would give him on the stock would be a valid mortgage; that Bradley wanted $12,000 for the stock; that Lazar offered $8,000 and they finally agreed on $11,000, $500 cash and the balance to be paid at $500 per month. Witness stated that the store was 25 by 80 feet; that the desk and cash register were in the middle; that he checked piece goods and Mr. Turner checked shoes so as to advise Lazar the value of the stock.

Witness denied being an associate of Lazar, said that he owned a space in the Wilmor store in Oklahoma City just as Lazar and Turner did, but that their businesses were separate.

James E. Turner testified substantially as did witness Polin, but in addition to owning a shoe department in the Wilmor store in Oklahoma City, he also owned a shoe department in Lazar's store at Okmulgee, known as Jay's. He operated his shoe business at both stores under the name "Leah's"; he denied that either he or Polin were introduced by Lazar to Bradley as associates of Lazar. He said that he was never more than 25 feet from Bradley and Lazar as the negotiations for the sale of the store were going on, and denied hearing Lazar make representations to Bradley to the effect that he was owner and president of Wilmor's, or that he owned a blouse factory in the east, or had a Dun & Bradstreet rating of $200,000, or that the mortgage he was to give Bradley on the stock of goods would be a valid mortgage. Witness denied hearing Lazar tell Bradley that he owned a store at Ada, or owned one at McAlester.

Ruby Jones testified that she was a niece of Bradley and that when he sold out to Lazar that Lazar hired her as manager of the Okemah store; that she was in the store while the negotiations for the sale were going on but did not try to listen in on the conversations and did not know the terms of the agreement reached; that Lazar sent for a new padlock on August 7, 1951 after Bradley told her that he had sold the store to Lazar. Witness stated that Lazar would often load up his car with goods to take to other stores and testified to preparing boxes of goods for shipment to other places, stating that she kept a record of all such transactions, and testified that goods would be sent to Okemah from other stores; that in 1952 Lazar took from the store $1,858.55 in goods and brought in $1,680.40.

Witness stated that after Lazar missed a payment on the note that Bradley came in the store and used bad language and that both he and Lazar used bad language, but that Bradley started it, and she told Lazar that she would have to quit, that she did not like to work under such circum-

stances. She also stated that prior to this fuss that Bradley had accused her of aiding Lazar and said she was as low down as he was. That he told her "you won't be working long, because I am going to close it up". She stated that she resigned May 3, 1952, and that Rhoda Little took her place. She stated that after bankruptcy proceedings were instituted against Mr. Lazar that he instructed her not to deposit any more money in the Bank but to purchase money orders with the receipts and send to him, which she did.

Rhoda Little testified that Mr. Lazar put in fluorescent lights, some new shelving and several tables after he purchased the store, and re-arranged displays.

The defendant testified, and on direct examination stated that he lived in Oklahoma City, was 56 years of age, married, had a daughter, a son who was a soldier in Japan, and had one grandbaby; that he had been a merchant for some thirty years; that he came to Okemah at the invitation of Mr. Bradley on August 7, 1951, about 2:30 P.M., accompanied by Mr. Polin and Mr. Turner; that he immediately went into the business of talking about the store that was for sale; that Mr. Polin checked the piece goods and Mr. Turner checked the shoes; that all four men were reasonably close together during the entire time of conversation; that he never represented to Mr. Bradley that he was owner and president of the Wilmor Department Store; that the matter of his rating with Dun & Bradstreet was not mentioned. He identified defendant's Exhibits 7 and 7A, Dun & Bradstreet rating book, and read from page 202 where it says, "$10,000 to $20,000 good pay"; admitted that he did tell Mr. Bradley that he had three buying offices in New York; testified that at no time was there any mention of a blouse factory or that he owned a blouse factory; that he identified exhibits of merchandise taken from the store and brought into the Oklahoma store; that while he, Lazar, was in Okemah he brought into that store $18,000 worth of merchandise and during the same period transferred from that store to other stores, merchandise valued at $7,500. He was not asked and did not reveal what his receipts in money amounted to from sale of goods from the Okemah store. He stated that an involuntary petition in bankruptcy was filed against him on March 6, 1952 and the same was still pending at the time of his trial.

Defendant denied telling Mr. Bradley that he owned a store at McAlester and one at Ada, but stated that in addition to the Kiddie Land department at Wilmor's in Oklahoma City he owned a store at Okmulgee and one at Wewoka at the time he purchased the Okemah store. He stated that when he gave Bradley a mortgage on the stock of goods he thought it was a valid mortgage, and denied telling Bradley after the trouble that he knew all along that the mortgage was not good. He claimed that Bradley threatened to kill him if Lazar should beat him out of his store and Lazar stated that he quit coming to Okemah and had the clerks send him the proceeds from sales by money orders.

Witness stated that the shelving he installed cost over $120, the tables over $70, and lights and fixtures over $100.

The record discloses, as contended by the Attorney General, that one of the invoices introduced by the defendant covering goods said to have been shipped directly to Okemah from the seller had attached to it a bill of lading showing that the goods were actually sent to Oklahoma City (Defendant's Exhibit No. 5.)

On cross-examination of the defendant by the State it was developed that he was employed by the Weimer Department Store, Houston, Texas, for about two years, and before that he worked for Lavine Brothers Department Store, and was fur buyer for all of their sixteen stores, and had worked with Rude, the Leader Department Store, Dallas; that he had been in the shoe business himself either under the name of Jack Lazar or Jacob Lazar; that he was christened Jacob Lazar, then admitted that it was as Jacob Benjamin Lazarvitch, but that 35 years ago at Omaha, Nebraska, he went into court and dropped the "vitch" from his name. He admitted that he had gone into bankruptcy three times previously. He stated that the Wilmor store was formerly Swarts'; said he: "I happened to

be in Dallas on a buying trip, when I ran into Swarts, who owned this store. He asked me if I didn't want to go to work for him, and I told him 'No'. He said, 'I can use you, Jack, if you will go to work for me'. I said, 'You can't pay me enough money', and he says, 'You write your own ticket.' I wrote a two-year contract for him to pay me the first year $1250 a month, plus fifteen per cent of the profits; and the second year he was to pay me $1000 a month, plus twenty per cent of the profits". Witness stated that he had a photostat copy of the contract in his brief case. He said he worked only two and a half months, and went to work for three sisters who operated a chain of about 150 stores. He managed the Chicago store, but a little over a year later moved back to Oklahoma City and worked for the General Jobbers Company for about a year, and then Wilmor's having succeeded Swarts, he put a department in the Wilmor store, known as Kiddie Land.

Defendant denied that after purchasing the Bradley Store that he protested to having to put up a check or deposit with the Public Service Company for service for the store. He denied that he told Mr. Miracle, of the Public Service Company and who waited on him, that he had a Class A rating with Dun & Bradstreet and there was no need for putting up a deposit, but admitted that he might have, except he denied knowing what a "Class A" rating was, but if he told Mr. Miracle about a rating it would have been as it appeared in the rating book, F-3. Witness repeated that he did not know what a "Class A" rating was, and did not think there was any such rating.

Defendant was asked about a cashier's check for $1,800, and another one for $742, and he said he intended to buy goods with the $1,800 but lost part of it and part went for expenses of the trip. He then said he lost the money gambling. This is assigned as error. He said he paid an old debt that he owed his sister with the other check.

As to his buying offices in New York City, defendant admitted that he did not maintain such offices, but merely placed orders with such buyers and the buyers placed the orders with manufacturers and charged the manufacturer a per cent on sales and that it did not cost him one cent to place such orders, and that anyone could place orders with the buying "offices" or companies.

William D. Miracle testified for the State on rebuttal and stated that he was employed by the Public Service Company of Oklahoma at the Okemah office, and that on August 9, 1951, Mr. Lazar told him that he had a Class A rating with Dun & Bradstreet and because of that should not be required to put up the $20 deposit for electrical service. Witness said that there was so much discussion about it that he took the matter up with his manager. The defendant was required to put up the deposit.

This concluded the evidence, and the court overruled a demurrer to the evidence interposed by the defendant.

█ As we have so often said, in passing on the sufficiency of the evidence, the function of the Criminal Court of Appeals is limited to ascertaining whether there is a basis, in the evidence, on which the jury can reasonably conclude that the accused is guilty as charged. Larkey v. State, Okl. Cr., 245 P.2d 751; Campbell v. State, Okl. Cr., 247 P.2d 281; Williams v. State, Okl. Cr., 263 P.2d 527.

From the recited evidence, we see that there was a sharp conflict in the testimony of the witnesses for the State and the witnesses for the defendant. An important point, it seems to us, and that neither the State or the defense clearly developed, was, who in the first place proposed that the security Bradley was to take be a chattel mortgage on the stock of merchandise that he was selling. Bradley had advertised that with collateral the purchaser would need no money, but could pay for the stock by time payments. The natural assumption would be that the collateral hypothecated would cover property that would remain intact; for example, real estate, or personal property such as live stock, or personalty that could not be sold without the proceeds being applied on the debt, as otherwise the purchaser could hold a sale and the stock might be disposed of

in a matter of days, with the mortgagee left without security of any kind, unless the mortgagor was so financially well off and sound as to be entitled to credit without collateral to secure a note of $10,500.

The transaction was so unusual as to present a situation where one or both of the parties to the transaction were most ignorant and naive if in truth they thought that Bradley was secured at all by the chattel mortgage on the stock of goods for which he delivered a bill of sale and the key to the store one to three days before he was even given the executed chattel mortgage. Most assuredly the purchaser, Lazar, trusted Bradley in that Bradley might have had creditors who could have proceeded against the stock, if any creditors existed and had not been paid. Tit. 46 O.S.1951 § 94. Still, Lazar only paid $500 down. He received $60 from the cash register and immediately commenced a sale, as he was taking no chances. But Bradley was placing his stock where it could be disposed of at retail almost instanter, and where Lazar could and did dispose of part of it in bulk by sending it to his other stores, and at least some of it to Leah's in Oklahoma City, a department in Wilmor's owned by Mr. Turner, one of defendant's witnesses. While the defendant testified that he sent in $18,000 in merchandise to the Okemah store while taking out $7,500, it was not disclosed how much in money was derived from the cash sales in the Okemah store or the value of the stock at the time the store was closed on account of the bankruptcy proceedings.

Bradley, the prosecuting witness, explains his conduct in the matter by claiming that Lazar gained his confidence by false representations.

In Rucker v. State, supra, we said [88 Okl.Cr. 15, 195 P.2d 302]:

"In every 'confidence game' a false pretense is involved, but every 'false pretense' does not involve a confidence game, and crime of confidence game is not established by mere proof that property has been obtained by false pretense, the proof to support a conviction for a 'confidence game' must show that the victim parted with his property because of the confidence he reposed in the swindler, or in the trick, divice or false representation used to effect the swindle."

Bradley testified that he had been in Wilmor's store in Oklahoma City; that it was a big three story store; that Lazar told him he was the owner and president, that he had a $200,000 credit rating with Dun & Bradstreet, maintaining three buying offices in New York City, owned a blouse factory in the east, owned certain retail stores in Oklahoma and had rented buildings to establish stores at McAlester and Ada to afford an outlet for the Oklahoma City store and his great purchasing power; that he would place a Wilmor sign on the Okemah store; that he would maintain a $25,000 stock at Okemah at all times. If Bradley was testifying truthfully, then he was relying on Lazar rather than the stock he was selling Lazar and which Bradley knew would soon be disposed of.

Was the jury justified in its conclusions of the guilt? Defendant denied that he made the representations accredited to him, except that he did say he had three buying offices in New York City. Where such a statement was given to show financial stability, buying power and vastness of operation, the natural import of such words would be that he maintained such buyers, but witness on cross-examination disclosed that the buying offices cost him not one cent and were not exclusive at all, but such offices accepted orders from any retail store and charged the factories for the service. It would have been as reasonable to have said that one "had" forty factories in the east because one could order goods from forty factories. Why the statement was limited to three purchasing offices is not disclosed.

Defendant denied that he even knew what a Dun & Bradstreet "A" rating was, when the very book that he introduced in evidence that showed his actual rating to be $10,000, to $20,000, good pay, also showed an "A" rating to be $500,000 to $750,000.

The defendant's witnesses who accompanied him on the buying call strongly disclaimed any association with Lazar, maintained that their departments in the

Wilmor store were separate and distinct. Nevertheless, Mr. Turner did own a department in the Lazar store at Okmulgee, and Lazar did ship shoes to Turner under the name of Leah's at Oklahoma City. The jury no doubt took all this into consideration in weighing the evidence. They also no doubt considered the positiveness of witnesses Polin and Turner in maintaining that they heard every word spoken by Lazar and Bradley as they carried on their negotiations, although Turner was busy checking shoes, and Polin busy checking piece goods, while on the other hand the two women clerks in the store heard nothing of the details of the sale, though they waited on only three customers during this time.

The cashier and vice president of the Citizens State Bank at Okemah testified that Bradley introduced Jack Lazar to him and Mr. Roy Taylor of the Bank, as the president and owner of Wilmor's Department Store at Oklahoma City, and Mr. William D. Miracle was positive that when Mr. Lazar came in to arrange for electrical service for the store that he objected to putting up a $20 deposit because he said he had an "A" rating with Dun & Bradstreet.

The jury no doubt considered the testimony of Mr. Lazar showing his extensive experience in managing large stores, purchasing goods for vast chains, "writing his own ticket" as he said, for $1250 per month and fifteen per cent of the profits as an employee of the former Swarts store in Oklahoma City. No doubt the jury concluded that a person with such qualifications and experiences would be acquainted with the elementary fact that the first thing in purchasing a stock in bulk is to comply with the bulk sales law, if the particular state has such a law, and with the fact that a chattel mortgage on a stock of goods subject to sale at retail would not afford security; that the bill of sale passed title and would subject a stock to the purchaser's creditors, yet Mr. Lazar maintained that he thought the chattel mortgage was "good" and afforded Mr. Bradley security.

No doubt the testimony of Bradley, which was never denied by Lazar, that Lazar at the time of the negotiations show-

ed him a card indicating that he, Lazar, was a member of the Masonic order, had a bearing with the jury in its consideration of defendant's efforts to obtain the confidence of Bradley.

It is our conclusion, therefore, that there is basis in the evidence on which the jury could reasonably conclude that the accused fraudulently obtained the confidence of J. L. Bradley; that Bradley relied on the false representations made and parted with his property by reason of his confidence in Lazar.

There is no basis for the contention that Bradley was an accomplice of Lazar for failure to comply with the bulk sales law, Tit. 46 O.S.1951 § 94, because there is no evidence that Bradley owed any money on the stock of goods transferred to Lazar. The matter of the necessity for corroboration of the testimony of Bradley on the vital elements involved was not raised at trial, we find no basis for such contention, and know of no reason for such requirement.

Complaint is made concerning questions asked defendant with reference to certain cashier's checks purchased by him from sale of goods at the Okemah store, particularly one question that elicited the answer from the defendant that he had lost around $1,800 gambling. The cross-examination complained of seems to have been made in good faith, to test the intentions of the defendant, who had testified that he had worked eighteen hours a day or more to make his business go, and to make the Okemah store an important part of his business.

It is said that the court failed to instruct the jury on the defendant's theory of the case. The only instruction requested by the defendant was one to advise the jury to acquit him.

The court instructed the jury in the language of the statute, Tit. 21 O.S. 1951 § 1541. We think the instructions were sufficient to emphasize to the jury that more than false pretense was necessary but that it was necessary that the confidence of Bradley must have been obtained and that by reason thereof he part-

ed with his stock of goods and that the representations bringing about the placing of this confidence were false. The fact that the dealings between Bradley and the defendant were in the form of a legitimate business transaction, did not prevent conviction if, in fact, it was a swindling operation, People v. Marmon, 389 Ill. 19, 58 N.E. 2d 603; People v. Brady, 272 Ill. 401, 112 N.E. 126, or the fact that Bradley by vigilance, such as consulting an attorney and making inquiries by 'phone, might have found out that the representations later complained of were false. State v. Donaldson, 243 Mo. 460, 148 S.W. 79; 25 C.J. 598–599, § 26; 35 C.J.S. False Pretenses, § 15.

We think that the term "confidence game" is so well understood that in the absence of a request that the term be specifically defined the failure of the court to define the term did not constitute error.

We are compelled from the above to, and do affirm the verdict and judgment of the District Court of Okfuskee County.

JONES and BRETT, JJ., concur.